297 P.3d 188

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Chester PACQUING, Petitioner/Defendant–Appellant.

No. SCWC–29703.

Supreme Court of Hawai'i.

March 22, 2013.

Craig W. Jerome, for petitioner.

Brian R. Vincent, for respondent.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., and Circuit Judge BROWNING, assigned by reason of vacancy, with ACOBA, J., dissenting.

Opinion of the Court by
RECKTENWALD, C.J.

Chester Pacquing was charged with one count of Unauthorized Possession of Confidential Personal Information (UPCPI) in relation to two traffic stops in which he identified himself to a police officer using the name, date of birth, and address of his former neighbor, the Complainant in this case.

Pacquing moved to dismiss the charge as a de minimis violation of the UPCPI statute, on the ground that his conduct did not actually cause or threaten the harm sought to be prevented by the statute, or did so only to a trivial extent. *See* Hawai'i Revised Statutes (HRS) § 702–236(b). In support of his argument, Pacquing relied primarily on factors set forth by this court in *State v. Park*, 55 Haw. 610, 617, 525 P.2d 586, 591 (1974).

The Circuit Court of the First Circuit granted Pacquing's motion and dismissed the charge, without prejudice to the State charging Pacquing with the offense of Unsworn Falsification to Authorities.[1] The State appealed, and the ICA vacated the circuit court's dismissal order on the ground that the circuit court had not been presented with

1. The Honorable Michael A. Town presided.

all of the relevant circumstances surrounding the offense as required under this court's holding in *State v. Rapozo*, 123 Hawai'i 329, 235 P.3d 325 (2010). Specifically, the ICA noted that the circuit court was not aware that Pacquing was in possession of Complainant's driver's license number and partial social security number, which were contained on the citation Pacquing received at the initial traffic stop. Accordingly, the ICA remanded to permit the circuit court to consider "all the relevant circumstances."

Pacquing argues that the ICA erred in concluding that the circuit court was not presented with all of the relevant circumstances. He further argues the circuit court did not abuse its discretion in granting his motion to dismiss. Accordingly, Pacquing seeks to affirm the circuit court's dismissal order.

We conclude that Pacquing's arguments are without merit. Accordingly, we agree with the ICA that the dismissal order must be vacated, and the case remanded for further proceedings. However, while we reach the same result as the ICA, our reasoning differs. Specifically, we do not find the information regarding Complainant's driver's license number and partial social security number to be dispositive. Rather, we conclude that the circuit court abused its discretion in concluding that Pacquing's conduct constituted a de minimis violation of the UPCPI statute because, as set forth below, Pacquing's conduct actually caused or threatened the harm sought to be prevented by the UPCPI statute, and Pacquing failed to meet his burden of demonstrating the results of his conduct were trivial. *See* HRS § 702–236(b). We therefore affirm the ICA's judgment.

## I. Background

### A. Factual history

The following facts are taken from the submissions of the parties to the circuit court, and are undisputed.

On March 23, 2008, at approximately 11:00 p.m., Honolulu Police Department (HPD) Officer Barry Danielson observed a black Acura Integra being operated with an expired vehicle tax emblem. Officer Danielson initiated a traffic stop and pulled the vehicle over near the intersection of North King Street and Kalihi Street. Officer Darrin Lum arrived to assist Officer Danielson.

Officer Lum observed Pacquing in the driver's seat of the vehicle. He asked for Pacquing's license, registration, and proof of no-fault insurance. Pacquing was unable to produce the requested documents, but identified himself as Complainant. Pacquing also gave a date of birth and residential address.

Officer Lum proceeded to verify the information Pacquing provided. Dispatch informed Officer Lum that the Department of Motor Vehicles Licensing Division (DMV) had a record of Complainant with the date of birth and address given by Pacquing. Dispatch also provided Officer Lum with a description of Complainant from the DMV, which also matched Pacquing.

Officer Lum issued two citations in Complainant's name: one criminal citation for the offense of Driving Without Insurance, and one infraction citation for the offenses of Delinquent Vehicle Tax and Fraudulent Safety Check. Pacquing signed both citations with Complainant's name.

Officer Lum later discovered that, although he gave Pacquing a copy of the criminal citation, he did not give him a copy of the infraction citation. Officer Lum proceeded to the address Pacquing had provided to deliver the citation. When no one answered the door, Officer Lum left the infraction citation in the mailbox.

On March 24, 2008, Complainant went to the Kalihi Police Station and informed the police that he had found the citation in his mailbox and believed it to be in error. Complainant stated that he did not own or operate the black Acura Integra listed on the citation, nor was he involved in a traffic stop at the time listed on the citation. HPD Officer Tish Taniguchi initiated a police report, and relayed the information to Officer Lum.

On April 7, 2008, Officer Danielson again initiated a traffic stop on the same black Acura Integra. Officer Lum again arrived to assist. Officer Danielson observed Pacquing

in the driver's seat, and asked for his license, registration, and proof of no-fault insurance. Pacquing stated that he did not have any picture identification, but that he recently received a citation for the same violation. Pacquing presented Officer Danielson with the March 23, 2008 criminal citation issued by Officer Lum.

Officer Lum asked Pacquing to exit the vehicle and sit in Officer Lum's HPD issued vehicle. Officer Lum asked another officer to locate Complainant and escort Complainant to the scene. Complainant arrived at the scene at approximately 3:00 a.m., and identified the defendant as "Chester Pacquing." Complainant related that Pacquing used to be his neighbor, and that Pacquing did not have permission to use any of Complainant's personal information.

Officer Lum asked Pacquing if his name was "Chester Pacquing." Pacquing responded in the affirmative, and stated that he was scared because he "had some warrants and did not want to get arrested." Pacquing acknowledged that he used to live near Complainant. Officer Lum then placed Pacquing under arrest.

## B.  Circuit court proceedings

On April 14, 2008, Pacquing was charged by way of complaint with one count of UP-CPI, in violation of HRS § 708–839.55,[2] in relation to his possession of Complainant's confidential personal information[3] on or about March 23, 2008, to and including April 7, 2008.

On September 2, 2008, Pacquing filed a Motion to Dismiss, or in the Alternative,

Motion for Bill of Particulars. In a supplemental memorandum to the motion, Pacquing argued that the charge should be dismissed because the State could not prove he was in possession of Complainant's confidential personal information, since the information came from Pacquing's memory and was possessed only in his mind. Pacquing asserted that he was possibly guilty of "some degree of Identity Theft," but not UPCPI. Pacquing also acknowledged that he possessed Complainant's confidential personal information on April 7, 2008 in the form of the citation, but argued that "[t]he fact that it was memorialized on a piece of paper and given to [Pacquing] does not change a thing." With regard to his alternative motion for a bill of particulars, Pacquing sought clarification as to whether the date of the offense was March 23, 2008 or April 7, 2008. The circuit court ultimately denied the motion, and Pacquing does not challenge this ruling on appeal.

On October 6, 2008, Pacquing filed a Motion to Dismiss for De Minimis Violation, which is the subject of the instant appeal. Along with the motion, Pacquing submitted a declaration of counsel, which acknowledged that Pacquing was pulled over on March 23, 2008 and April 7, 2008; that on the first occasion, he provided officers with Complainant's name, date of birth and address; and that on the second occasion, he presented officers with the citation he had previously received.

Pacquing asserted that his conduct constituted a de minimis infraction under the fac-

---

**2.** HRS § 708–839.55 (Supp.2006) provides:

(1) A person commits the offense of unauthorized possession of confidential personal information if that person intentionally or knowingly possesses, without authorization, any confidential personal information of another in any form, including but not limited to mail, physical documents, identification cards, or information stored in digital form.
(2) It is an affirmative defense that the person who possessed the confidential personal information of another did so under the reasonable belief that the person in possession was authorized by law or by the consent of the other person to possess the confidential personal information.

(3) Unauthorized possession of confidential personal information is a class C felony.

**3.** "Confidential personal information" is defined as:

information in which an individual has a significant privacy interest, including but not limited to a driver's license number, a social security number, an identifying number of a depository account, a bank account number, a password or other information that is used for accessing information, *or any other name, number, or code that is used, alone or in conjunction with other information, to confirm the identity of a person.*
HRS § 708–800 (Supp.2006) (emphasis added).

tors set forth in *Park*.[4] Pacquing argued that, rather than the offense of UPCPI, "the likely assumption would be that he was committing identity theft or violating some duty to not mislead a police officer[,]" such as Unsworn Falsification to Authorities in violation of HRS § 710–1063.[5] Thus, Pacquing argued that "it should be assumed that [he] envisioned the consequences of his actions to be a violation of HRS § 710–1063(1)(b)" and Unsworn Falsification to Authorities was therefore the proper charge. In addition, Pacquing argued that the circumstances surrounding the offense, the resulting harm or evil, and the probable impact on the community were minimal because Complainant immediately informed the police that he was not involved in the traffic stop, and the police believed Complainant. Finally, although Pacquing appeared to concede that the State did not have improper motives in charging him with UPCPI, he argued that his conduct "did not rise to the level of a felony offense[,]" and that he therefore had been over-charged. Pacquing reiterated his argument that the proper charge for his conduct was the misdemeanor offense of Unsworn Falsification to Authorities.

Pacquing also argued that his conduct constituted a de minimis violation under the applicable statute, HRS § 702–236(1)(b) and/or (c).[6] Specifically, Pacquing argued that the legislature did not intend to prevent his conduct under UPCPI, but rather under Unsworn Falsification to Authorities. He also argued that a conviction for UPCPI would be unduly harsh.

The State filed a response to Pacquing's motion, setting forth facts substantially similar to those set forth above, but with somewhat more detail than was set forth in Pacquing's declaration of counsel. For example, the State asserted that Complainant informed the officers that Pacquing "used to be his neighbor[.]" The State also asserted that, upon being arrested, Pacquing informed the officers that he "was scared because [he] had some warrants and did not want to get arrested."

The State argued that Pacquing's conduct implicated the purpose of the UPCPI statute which, according to the State, was to "prohib-

---

4. *Park* involved charges against several political candidates for failing to timely file campaign expense reports. 55 Haw. at 611, 525 P.2d at 588. This court stated that the factors to be taken into account in consideration of a de minimis motion "should include":

> the background, experience and character of these defendants-appellees which may indicate whether they knew of, or ought to have known, the requirements of [the law requiring filing of campaign expense statements]; the knowledge on the part of these defendants-appellees of the consequences to be incurred by them upon the violation of the statute; the circumstances concerning the late filing of these statements of expense; the resulting harm or evil, if any, caused or threatened by these infractions; the probable impact of these violations upon the community; the serious[n]ess of the infractions in terms of the punishment, bearing in mind, of course, that the punishment can be suspended in proper cases; the mitigating circumstances, if any, as to each offender; the possible improper motives of the complainant or the prosecutor; and any other data which may reveal the nature and degree of the culpability in the offense committed by each defendant-appellee.

> *Id.* at 617, 525 P.2d at 591.

5. HRS § 710–1063 (1993) provides in relevant part:

(1) A person commits the offense of unsworn falsification to authorities if, with an intent to mislead a public servant in the performance of the public servant's duty, the person:

. . .

> (b) Submits or invites reliance on any writing which the person knows to be falsely made, completed, or altered[.]

. . . .

(2) Unsworn falsification to authorities is a misdemeanor.

6. HRS § 702–236 (1993) provides in relevant part:

(1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:

(a) Was within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or

(b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

(c) Presents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense.

it the intentional or knowing possession of the confidential personal information of another person, without authorization, in any form." The State further argued that Pacquing's conduct caused the harm or evil sought to be prevented by the UPCPI statute, and was not trivial, because "[h]ad [Pacquing] not been caught, Complainant would have suffered repercussions of two unjustified traffic citations." Finally, the State argued that Pacquing's conduct was "envisaged by the legislature in forbidding the offense" because the language of the statute "unquestionably proscribes [Pacquing's] conduct."

The circuit court held a hearing on Pacquing's motion on October 30, 2008, at which the parties generally reiterated the arguments set forth in their briefs and the court took the matter under advisement. On February 11, 2009, the circuit court filed its order granting Pacquing's motion to dismiss. The circuit court dismissed the complaint without prejudice to the State charging Pacquing with Unsworn Falsification to Authorities within 90 days. The circuit court's findings of fact generally repeated the facts set forth above. The circuit court entered the following relevant conclusions of law:

2. The decision to dismiss a prosecution based upon it being a de minimis infraction is one made by the court. The Hawaii Supreme Court has adopted a "totality of the circumstances" test for determining whether an offense is to be treated as a de minimis infraction. *State v. Park*, 55 Haw. 610, 525 P.2d 586 (1974).

3. As stated in *Park*, the following factors should be considered in determining whether to dismiss a charge as de minimis:

a. The background, experience and character of the defendant which may indicate whether the defendant knew of, or ought to have known of the requirements of the law;

b. The knowledge on the part of the defendant of the consequences to be incurred upon a violation of the statute;

c. The circumstances concerning the offense[;]

d. The resulting harm or evil, if any, caused or threatened by the infractions;

e. The probable impact of the violation upon the community;

f. The seriousness of the infraction in terms of the punishment, bearing in mind that the punishment can be suspended in proper cases (but in felony cases, suspended sentence is not an authorized disposition under HRS § 706–605);

g. The mitigating circumstances, if any, as to the offender;

h. The possible improper motives of the complainant or the prosecutor;

i. Any other data which may reveal the nature and degree of the culpability in the offense committed.

4. The consequences of the first two *Park* factors, assuming [Pacquing] knew the requirements of the law, and therefore knew he should not have given another person's information as his own, the logical conclusion would be that he was committing some form of identity theft or violating a duty to not mislead a police officer.

5. With all due regard to the discretion of the Prosecuting Attorney's Office, the proper charge in this case exists pursuant to HRS § 710–1063, Unsworn Falsification to Authorities. . . .

6. HRS § 710–1063 is a consequence that a person in [Pacquing's] position could reasonably expect to incur.

7. The circumstances surrounding the offense charged, the resulting harm or evil in this case, and the probable impact upon the community, are minimal. The police immediately believed the Complainant . . . when he informed them that he did not own a black Acura and he did not get pulled over on March 23, 2008. [Complainant] did not have to appear in traffic court and did not incur any traffic violations as a result of [Pacquing's] conduct. This minimal result does not warrant a felony charge for [Pacquing], or worse, a felony conviction.

8. The punishment in this case, a felony conviction for [Pacquing], and a potential

five-year term of incarceration, is too serious and too harsh. [Pacquing's] actions did not rise to the level of a felony offense. Again, [Pacquing's] conduct may constitute a misdemeanor pursuant to HRS § 710–1063(1)(b).

9. [Pacquing], being only 24 years old, is a mitigating circumstance in his favor. The non-violent nature of this offense, and [Pacquing's] history of non-violence, are also mitigating factors.

10. The [c]ourt is also concerned that [Pacquing] has been over-charged and his misdemeanor conduct was pidgeon-holed [sic] into a felony statute.

11. [Pacquing's] conduct caused harm only to a minimal extent, and certainly not serious enough to warrant a felony conviction.

12. [Pacquing's] conduct also does not fall within that which was envisioned by the legislature in forbidding the charged offense.

13. [Pacquing's] conduct was meant to be prohibited by HRS § 710–1063(1)(b), Unsworn Falsification to Authorities.

14. The harshness of a conviction is a factor when determining whether a charge should be dismissed under HRS § 702–236. *State v. Vance*, 61 Haw. 291, 602 P.2d 933 (1979). In the instant case, a conviction for [Pacquing] could result in an indeterminate five-year term of imprisonment.

15. [Pacquing's] conduct constitutes a de minimis infraction within the meaning of HRS § 702–236.

The State timely filed a notice of appeal on March 12, 2009.

The parties subsequently appeared before the circuit court on a motion for revocation and sentencing in two unrelated criminal cases involving Pacquing, Cr. Nos. 05–1–1548 and 08–1–1492. At the hearing, Pacquing's counsel raised a "housekeeping matter" in relation to the instant case, and the following exchange occurred:

> [DEFENSE COUNSEL]: . . . . [F]or the de minimis motion we didn't take testimony, Your Honor, but [the deputy prosecuting attorney (DPA)] and I agreed now kind of retroactively to stipulate to the facts that were laid out in both of our memoranda, if that's okay.
>
> THE COURT: That's not on the calendar so what am I supposed to do, just make a decision?
>
> [DEFENSE COUNSEL]: Well, my appellate section is telling me that there may not actually be a record of fact because we agreed. Since we didn't take any testimony we kind of agreed to the facts. But in case we didn't mention it at the motion, we just wanted to agree to the facts.
>
> THE COURT: To do that I need to call the case and place that stipulation on the record and have him agree that he doesn't need to cross-examine anybody[.]
>
> [DEFENSE COUNSEL]: Oh, that's— that's fine, Your Honor, I'll address it with my appellate.
>
> THE COURT: So am I making a record today or not?
>
> [DEFENSE COUNSEL]: I—I don't think—I mean, I'm not sure. I don't want to speak for [the DPA].
>
> [DPA]: Well, my understanding is that back then, I am pretty sure that both sides already stipulated to the facts that were in the respective memorandum [sic], there are no material differences in the recollection of the facts. However, just to supplant that, I'll make sure that it is a stipulation. I think that we're both in agreement that those facts should be made part of the record even if they weren't made part of the record back then.

The circuit court proceeded to call the instant case, Cr. No. 08–1–0556, and asked defense counsel and Pacquing, "You've made the record that there's a stipulation there, you're making it part of the record, and your client is waving any cross-examination?" Both defense counsel and Pacquing agreed, and the proceedings were then concluded.

### C. Appeal

On appeal, the State argued that the circuit court abused its discretion in granting Pacquing's motion to dismiss. Specifically, the State challenged the circuit court's apparent conclusion that UPCPI was not the proper charge for Pacquing's conduct. The

State also challenged the circuit court's conclusions that the impact of Pacquing's conduct was minimal, the punishment for UPCPI was "too harsh," and Pacquing's youth and lack of a violent criminal history were mitigating factors. The State specifically challenged the circuit court's conclusions of law numbered 4 through 15.

Pacquing argued that the circuit court did not abuse its discretion in granting the motion to dismiss because Pacquing's conduct did not cause or threaten the harm or evil sought to be prevented by UPCPI. Pacquing asserted that UPCPI was designed to prevent "identity theft-related crimes, which cause[ ] monetary loss to victims[.]" Pacquing also argued that the circuit court's application of the *Park* factors to the facts of this case was correct.

On May 27, 2010, approximately ten months after the filing of its opening brief, the State filed a motion to supplement the record on appeal with the transcript of a preliminary hearing held on April 11, 2008.[7] In the transcript of the preliminary hearing, Officer Lum testified regarding his encounters with Pacquing on March 23, 2008 and April 7, 2008. In addition to the facts set forth *supra*, Officer Lum testified that he wrote Complainant's driver's license number and the last four digits of his social security number on the citation he gave to Pacquing on March 23, 2008.

Pacquing did not file a response to the State's motion to supplement the record, and the ICA approved the motion and ordered that the record be supplemented. Pacquing subsequently filed a motion for reconsideration, in which he argued that it was not appropriate for the ICA to consider the transcript because (1) the transcript was not before the circuit court, (2) the contents of the transcript had not been received into evidence, and (3) the testimony from the preliminary hearing was not considered by

the circuit court in ruling on Pacquing's motion to dismiss. The ICA denied Pacquing's motion for reconsideration.

In a Memorandum Opinion, the ICA vacated the circuit court's dismissal order and remanded for further proceedings. The ICA concluded that the circuit court "was not presented with all the relevant circumstances necessary for it to properly exercise its discretion in rendering the decision[,]" as required under this court's opinion in *Rapozo*. Specifically, the ICA noted that neither party cited the preliminary hearing testimony in connection with Pacquing's de minimis motion or introduced the citations issued to Pacquing in Complainant's name.[8] The ICA concluded:

> Evidence that Pacquing possessed and used Complainant's driver's license number and the last four digits of Complainant's social security number constitutes evidence of relevant circumstances pertaining to the charged offense. If the Circuit Court had considered such evidence, it may have affected the Circuit Court's analysis. For example, Pacquing argues that because information regarding a person's name, birth date, and address is easily obtainable through lawful means, Complainant did not have a significant privacy interest in such information. The same argument would not apply to Complainant's driver's license number or the last four digits of Complainant's social security number.

The ICA filed its judgment on February 23, 2012. Pacquing timely filed an application for a writ of certiorari. The State did not file a response.

## II. Standard of Review

■■■ We review a trial court's ruling on a motion to dismiss for de minimis violation for abuse of discretion. *State v. Rapozo*, 123

---

7. The Honorable Russel S. Nagata presided over the preliminary hearing.

8. The ICA concluded that the circuit court had not considered all of the relevant circumstances because it was not presented with the preliminary hearing transcript, which indicated that the citation Pacquing presented to the officers on April 7, 2008 contained Complainant's driver's

license number and a partial social security number. Pacquing argues that the preliminary hearing transcript was irrelevant because the circuit court's decision was not based on the type of confidential personal information in Pacquing's possession. We do not consider the preliminary hearing transcript in reaching our conclusion.

Hawai'i 329, 336, 235 P.3d 325, 332 (2010). A court abuses its discretion if it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. *Id.* (citation omitted).

## III. Discussion

### A. Pacquing's conduct did not constitute a de minimis violation of the UPCPI statute

HRS § 702–236(1) addresses the circumstances in which a prosecution may be dismissed as de minimis, and provides in relevant part:

(1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:

. . .

(b) Did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction[.]

■ This court has explained that the statute requires "that all of the relevant attendant circumstances be considered by the trial court." *Rapozo*, 123 Hawai'i at 337–38, 235 P.3d at 333–34. The defendant bears the burden of bringing these circumstances before the court for its consideration. *See, e.g., id.; State v. Oughterson*, 99 Hawai'i 244, 256, 54 P.3d 415, 427 (2002) ("[I]nsofar as the *defendant* advances a motion to dismiss on de minimis grounds, it is the *defendant*, and not the prosecution, who bears the burden of proof on the issue.") (emphasis in original). The defendant also bears the burden of establishing why dismissal of the charge as a

de minimis infraction is warranted in light of those circumstances. *Rapozo*, 123 Hawai'i at 331, 235 P.3d at 327. For the reasons set forth below, the circuit court abused its discretion in granting the de minimis motion because Pacquing's conduct caused or threatened the harm or evil sought to be prevented by HRS § 708–839.55, and Pacquing did not establish that his conduct was too trivial to warrant the condemnation of conviction.[9] *See* HRS § 702–236(1)(b).

### 1. Pacquing's conduct caused or threatened the harm or evil sought to be prevented by HRS § 708–839.55

Pacquing argues that his conduct did not cause or threaten the harm or evil sought to be prevented by the UPCPI statute because, Pacquing asserts, "[t]he statute sought to deter identity theft-related crimes, which cause monetary loss to victims[.]" Pacquing asserts that he did not possess Complainant's confidential personal information with the intent to commit identity theft, but rather to avoid arrest on outstanding warrants. As set forth below, Pacquing's argument is without merit because the legislative history behind the UPCPI statute indicates that it was intended to deter a broader range of conduct than "identity theft-related crimes."

■ As with all efforts to determine legislative intent, our inquiry into the harm or evil sought to be prevented by a statute relies primarily on the plain language of the statute itself. *Rapozo*, 123 Hawai'i at 338, 235 P.3d at 334. As stated, HRS § 708–839.55 proscribes "intentionally or knowingly possess[ing], without authorization, any confidential personal information of another in any form, including but not limited to mail, physical documents, identification cards, or

9. In *Park*, this court outlined several factors which trial courts should consider in determining whether to dismiss a charge as a de minimis infraction. 55 Haw. at 617, 525 P.2d at 591; *see also supra* note 4. Although this court has subsequently referenced the *Park* factors, *see e.g., Rapozo*, 123 Hawai'i at 344, 235 P.3d at 340, it has not expressly applied all of these factors in determining whether a trial court properly granted or denied a motion to dismiss a charge as a de minimis infraction, *see, e.g., id.; State v. Viernes,*

92 Hawai'i 130, 134–35, 988 P.2d 195, 199–200 (1999). Rather, our analysis has relied primarily on the language of the statute, and has considered the *Park* factors as appropriate to the circumstances of each case. *See, e.g., Rapozo*, 123 Hawai'i at 344, 235 P.3d at 340. Thus, while we do not "de-emphasize" the factors set forth in *Park, see* dissenting opinion at 195, 297 P.3d at 211, we consider these factors in light of the requirements set forth in the de minimis statute, as we have done consistently in our prior cases.

information stored in digital form." [10] Although the statute describes the conduct it proscribes, the resulting harm or evil the statute seeks to prevent is not immediately apparent. Accordingly, we must look to legislative history to determine the harm or evil sought to be prevented by HRS § 708–839.55. *See First Ins. Co. of Hawaii v. A & B Props.*, 126 Hawai'i 406, 415, 271 P.3d 1165, 1174 (2012) (noting that courts may look to legislative history to determine "the reason and spirit of the law").

The UPCPI statute originated from Act 65 of the 2005 legislative session. 2005 Haw. Sess. Laws Act 65, §§ 1–2 at 146–47; *see also* Hawaii Anti–Phishing Task Force, *Report on Electronic Commerce–Based Crimes* (2006) (hereinafter "Anti–Phishing Task Force Report"). Through Act 65, the legislature established a "Hawaii anti-phishing task force to develop state policy on how best to prevent further occurrences of phishing and other forms of electronic commerce-based crimes in the State." 2005 Haw. Sess. Laws Act 65, §§ 1–2 at 147. The legislature explained that, "in phishing scams, Internet scammers try to get information, such as credit card numbers, passwords, account information, or other personal information, by convincing Internet users to divulge the information under false pretenses." *Id.*, § 1 at 147.

Pursuant to Act 65, the task force submitted a report with findings and recommendations to the 2006 legislature. Anti–Phishing Task Force Report; *see also* 2005 Haw. Sess. Laws Act 65, § 2(d) at 148. Recognizing that "phishing is a relatively small part of the identity theft problem[,]" the report addressed "crimes and scams under the broader category of 'identity theft' *and those offenses committed as precursors to identity theft.*" Anti–Phishing Task Force Report at 3–4 (emphasis added). The report noted that, "[b]esides high-tech activities such as phishing and Internet-based fraud, there are other types of identity theft committed

against Hawaii residents involving very low-tech activities. Some of the perpetrators are close friends and family members who ... use without authorization the victim's confidential personal information to obtain credit." *Id.* at 4 (emphasis added). Accordingly, the task force also "discussed ways in which the State could deter the low technology, non-electronic activities, which frequently precede electronic commerce-based identity theft crimes in Hawaii." *Id.* at 4–5.

The task force undertook a detailed review of state identity theft statutes. *Id.* at 10–12, Appendices I and II. The task force noted that "many states define the act of identity theft as when a person uses another's personal identifying information for any unlawful purpose," while in other states, "possession alone of another's personal identifying information without authorization and with intent to defraud or commit a crime or for any unlawful purpose constitutes an offense[.]" *Id.* at 10–11.

The task force made the following recommendation relevant to the instant case:

> Law enforcement agencies in Hawaii have found it difficult to curb the rise in identity theft related crimes because identity thieves in possession of personal information that have not yet caused a monetary loss to the victim cannot be prosecuted for crimes other than petty misdemeanors. The Task Force supports legislation that will provide law enforcement with more efficient enforcement and stricter enforcement penalties for identity theft crimes.
> ● Specific Action: Amend [HRS § ] 708–839.8, Identity Theft in the Third Degree to include a crime for possession or transfer of "confidential personal information" and [HRS § ] 706–606.5 to include Identity Theft as a repeatable offense....

*Id.* at 22.

Proposed legislation arising out of the Anti–Phishing Task Force Report was first

10. The dissent concludes that Pacquing did not "possess" Complainant's confidential personal information because the information was not recorded in writing or digitally. Dissenting opinion at 204–05, 297 P.3d at 220–21. However, Pacquing does not raise this argument on appeal.

Moreover, this conclusion is contrary to the statutory language, which prohibits the unauthorized possession of confidential personal information *"in any form* [.]" HRS § 708–839.55 (emphasis added).

considered by the Senate Committees on Commerce, Consumer Protection, and Housing and Media, Arts, Science, and Technology. S. Stand Comm. Rep. No. 2508, in 2006 Senate Journal, at 1248–49. The Committees noted that "[t]he purpose of this measure is to increase the penalties for identity theft *and* make it a crime to intentionally or knowingly possess the confidential information of another without that person's authorization." *Id.* at 1248 (emphasis added). The Committees further noted:

> Hawaii law enforcement has found it difficult to curb the rise in identity theft related crimes when identity thieves in possession of personal information who have not yet caused a monetary loss to the victim cannot be prosecuted for crimes other than petty misdemeanor thefts. A nominal criminal consequence is inadequate to address and deter possession of another's personal information, and in fact perpetuates the larger problem of identity theft. Your Committees find that increasing the penalties for identity theft by amending the law to make identity theft an enumerated offense within the repeat offender statute, and amending the law to make intentionally or knowingly possessing confidential information of another without authorization a class C felony, will help to deter identity theft crimes.[ 11]

*Id.* at 1249.

However, the Committees diverged from the task force's recommendation that the offense of UPCPI be incorporated into the offense of Identity Theft in the Third Degree. Instead, the Committees amended the proposal to add a new section to prohibit UPCPI, stating:

> Your Committees further recognize that the unauthorized possession of confidential personal information should be treated as a separate offense from identity theft in the first degree, second degree, or third degree. *The purpose of enacting a new law for the unauthorized possession of confidential personal information is to fill the loophole under current law and provide for appropriate criminal prosecution.*

*Id.* at 1249 (emphasis added).

This history indicates that the statute was intended to deter a broader range of conduct than identity theft-related crimes. First, the legislative history indicates that, although the ultimate goal behind the UPCPI statute was to deter identity theft, the more immediate purpose was to "fill a loophole" and increase criminal penalties for conduct that would otherwise constitute a misdemeanor. *Id.* at 1248–49. Thus, the UPCPI statute was not enacted solely to prevent identity theft. Moreover, the legislature rejected the Anti–Phishing Task Force's recommendation to include the offense of UPCPI in the statute prohibiting Identity Theft in the Third Degree. *Id.* at 1249. It therefore appears that the legislature understood UPCPI to be distinct from identity theft, because it does not involve "a monetary loss to the victim[.]" *Id.*

Second, neither the plain language of the statute nor its legislative history establishes that the legislature intended to allow prosecution only where the defendant intended to commit identity theft. Indeed, the Anti–Phishing Task Force Report noted that the UPCPI statutes adopted in other jurisdictions often require that the defendant intended to use the information to defraud another or commit a crime, or acted with another unlawful purpose. Anti–Phishing Task Force Report at 10–12, Appendices I & II. However, neither the task force nor the legislature recommended a provision that would predicate the offense of UPCPI upon an intent to commit identity theft.

◼ Rather, HRS § 708–839.55 does not require that the defendant have any specific purpose in possessing the confidential personal information,[12] provided that the

---

**11.** These comments were largely incorporated into the Commentary to HRS § 708–839.55. *See* HRS § 708–839.55 cmt. (Supp. 2006).

**12.** Accordingly, we respectfully disagree with the dissent's assertion that the state of mind specified in HRS § 708–839.55, i.e., the intentional or knowing possession of confidential information, indicates that the purpose of the statute is limited to identity theft. Dissenting opinion at 197–98, 297 P.3d at 213–14. Respectfully, nothing in the statute requires the prosecution to prove that the defendant possessed confidential personal information for this, or any other, specific purpose. HRS § 708–839.55.

defendant possesses the information *"without authorization* [.]" (Emphasis added). Accordingly, Pacquing's argument that he did not commit UPCPI because he only intended to "mislead the police officer" and avoid arrest is unavailing, since there is nothing in the record to suggest Complainant authorized Pacquing to possess the information for that purpose.

Third, the legislative history evidences the legislature's intent to penalize Pacquing's conduct with a felony conviction. S. Stand Comm. Rep. No. 2508, in 2006 Senate Journal, at 1249. The legislature specifically noted, "A nominal criminal consequence is inadequate to address and deter possession of another's personal information, and in fact perpetuates the larger problem of identity theft." *Id.* Accordingly, although Pacquing argues that a potential felony conviction and indeterminate five year term of incarceration are too harsh in light of the potential for charging him with the misdemeanor offense of Unsworn Falsification to Authorities, this argument is unpersuasive.[13]

Finally, it is instructive to contrast the circumstances of this case with those in *Viernes,* where this court concluded that the circuit court did not abuse its discretion in dismissing as de minimis a prosecution for promoting a dangerous drug in the third degree. 92 Hawai'i at 135, 988 P.2d at 200. This court observed that the purpose of the statute at issue was to "respond to abuse and social harm" and "to counter increased property and violent crimes." *Id.* at 134, 988 P.2d at 199 (citation omitted). However, because the amount of methamphetamine possessed by the defendant was too small to be sold or used, his possession could not "lead to

abuse, social harm, or property and violent crimes." *Id.* Accordingly, we affirmed the circuit court's dismissal order on the ground that it was not possible for the defendant's possession to lead to the harm the statute sought to prevent. *Id.* at 134–35, 988 P.2d at 199–200.

■ In contrast, there is nothing in the facts of the instant case to suggest that Pacquing's possession of Complainant's confidential personal information could not lead to identity theft or other crimes. As stated, Pacquing had been in possession of Complainant's confidential personal information since an unspecified time when the two were neighbors. He used Complainant's confidential personal information to attempt to avoid arrest on two known occasions. Had he not been arrested on April 7, 2008, Pacquing would have had a continuing opportunity to utilize Complainant's confidential personal information for a variety of criminal purposes. Accordingly, Pacquing's possession of Complainant's confidential personal information "implicates the precise harm the legislature sought to avoid" in enacting the UPCPI statute.[14] *See Rapozo,* 123 Hawai'i at 342, 235 P.3d at 338 (noting that the defendant's possession of "an operable bullet with the potential to kill or seriously injure a human being, to cause other physical harm, or to be used in the commission of a crime" implicated the harm the legislature sought to prevent in prohibiting felons from possessing firearms and ammunition).

For the foregoing reasons, Pacquing's conduct caused or threatened the harm or evil

---

**13.** In addition, Unsworn Falsification to Authorities is intended to prevent harms relating to the "[e]fficiency and fairness of governmental operations and public confidence in public administration[.]" HRS § 710–1063 cmt. (1993). "[T]he falsification must be made with intent to mislead a public servant in the performance of the public servant's official duty." *Id.* Although the commentary notes that this conduct may also have "unfortunate consequences . . . for the individual whose life, freedom or property may be affected," the clear objective of the statute is to ensure that "information which the government relies upon not be falsified." *Id.*

The statute is not directed at harms to individuals such as Complainant. Thus, although it appears that the State additionally could have charged Pacquing with Unsworn Falsification to Authorities, the availability of this charge does not render Pacquing's conduct a de minimis violation of the UPCPI statute.

**14.** The State argued that Pacquing's conduct caused the harm or evil sought to be prevented by HRS § 708–839.55. *Viernes* is directly applicable on this point. Accordingly, we respectfully disagree with the dissent's assertion that this argument was waived by the State. Dissenting opinion at 198, 297 P.3d at 214.

sought to be prevented by the UPCPI statute.[15]

## 2. Pacquing did not establish that his conduct was too trivial to warrant the condemnation of conviction

HRS § 702–236(1)(b) permits a court to dismiss a charge as de minimis where the defendant's conduct "[d]id not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense *or did so only to an extent too trivial to warrant the condemnation of conviction* [.]" (Emphasis added). Before the court can make this determination, "all of the relevant facts bearing upon the defendant's conduct and the nature of the attendant circumstances regarding the commission of the offense should be shown to the judge." *Park,* 55 Haw. at 616, 525 P.2d at 591. It is an abuse of discretion for a circuit court to dismiss a charge as de minimis without considering "all of the relevant surrounding circumstances" as required under HRS § 702–236. *Rapozo,* 123 Hawai'i at 347, 235 P.3d at 343. The defendant bears the burden of proof on this issue, and thus bears the burden of providing evidence to support a finding that his or her conduct implicated the harm or evil sought to be prevented by the statute only to an extent too trivial to warrant the condemnation of conviction. *Oughterson,* 99 Hawai'i at 256, 54 P.3d at 427; *State v. Carmichael,* 99 Hawai'i 75, 80, 53 P.3d 214, 219 (2002).

As set forth below, we conclude that the circuit court abused its discretion in concluding that the effect of Pacquing's conduct was too trivial to warrant the condemnation

of conviction.[16] First, the circuit court disregarded principles of law set forth in the de minimis statute when evaluating the effect of Pacquing's conduct. *See Rapozo,* 123 Hawai'i at 336, 235 P.3d at 332 ("A court abuses its discretion if it clearly exceeded the bounds of reason or *disregarded rules or principles of law* or practice to the substantial detriment of a party litigant.") (emphasis added) (citation omitted). Second, Pacquing failed to carry his burden of demonstrating that his possession of Complainant's confidential personal information was trivial, because he failed to address "the nature of the conduct alleged and the nature of the attendant circumstances[.]" HRS § 702–236(1).

In granting Pacquing's motion to dismiss, the circuit court stated:

> The circumstances surrounding the offense charged, the resulting harm or evil in this case, and the probable impact upon the community, are minimal. The police immediately believed the Complainant ... when he informed them that he did not own a black Acura and he did not get pulled over on March 23, 2008.
>
> [Complainant] did not have to appear in traffic court and did not incur any traffic violations as a result of [Pacquing's] conduct. This minimal result does not warrant a felony charge for [Pacquing], or worse, a felony conviction.

In so concluding, the circuit court addressed the harm "actually cause[d]" by the offense. *See* HRS § 702–236(1)(b). However, the circuit court did not address the harm "threaten[ed]" by the offense, as required under HRS § 702–236(1)(b). The harm threatened by Pacquing's conduct is particu-

---

15. In the circuit court, Pacquing also argued that his conduct constituted a de minimis offense under HRS § 702–236(1)(c), which applies to conduct that "[p]resents such other extenuations that it cannot reasonably be regarded as envisaged by the legislature in forbidding the offense." His application does not contain any arguments that specifically address this prong of the statute, and the only arguments which could reasonably be construed to apply are those we reject above. Accordingly, we do not separately address this prong of the statute.

16. The circuit court did not make an express conclusion with regard to triviality. Rather, the circuit court concluded that "[Pacquing's] con-

duct caused harm only to a *minimal* extent, and certainly not serious enough to warrant a felony conviction." (Emphasis added). Although "minimal" and "trivial" do not have precisely the same meaning, *compare Merriam–Webster's Collegiate Dictionary* 791 (11th ed. 2003) (defining "minimal" as "the least possible," "barely adequate" or "very small or slight") *with Black's Law Dictionary* 1647 (9th ed. 2009) (defining "trivial" as "[t]rifling; inconsiderable; of small worth or importance"), we presume that the circuit court intended this conclusion to apply to the triviality requirement set forth in the de minimis statute.

larly relevant here, where the harm to Complainant was avoided only through a fortuitous turn of events: Officer Lum neglected to give Pacquing a copy of the infraction citation following the first traffic stop and thereafter traveled to Complainant's home to deliver the citation, Complainant then advised the police that he was not involved in the traffic stop, and Pacquing then was arrested for UPCPI before any further citations could be issued.

Had any of these events not occurred, Complainant would have incurred traffic citations for conduct in which he did not engage. Being unaware of the citations, Complainant would not have presented for any court appearances in relation to the citations. A bench warrant then could have been issued for Complainant's failure to appear. In addition, Pacquing would have evaded arrest on the bench warrants he was attempting to avoid, and could have continued to receive additional citations in Complainant's name.[17]

The circuit court did not address any of these circumstances, or any other circumstances threatened by Pacquing's conduct, as required under HRS § 702–236(1)(b). Because the circuit court disregarded principles of law set forth in HRS § 702–236(1), it abused its discretion in granting Pacquing's motion to dismiss.

In addition, both Pacquing and the circuit court failed to adequately address the circumstances surrounding the offense. *Rapozo* is directly analogous on this point. There, the defendant was charged with Ownership or Possession Prohibited of Any Firearm or Ammunition By a Person Convicted of Certain Crimes, in relation to an incident in which she was arrested and a bullet was found in her bra during a search at the police station. *Rapozo*, 123 Hawai'i at 331, 235 P.3d at 327. The circuit court dismissed the charge as a de minimis violation. *Id.* On appeal, this court concluded that the circuit court's dismissal constituted an abuse of discretion because the defendant failed to adequately address her alleged conduct and attendant circumstances. *Id.* Although her counsel's declaration stated that she was in possession of the bullet because she intended to have it made into a charm for a bracelet, she

> offered no further evidence or testimony to corroborate that asserted explanation. She did not explain why, if her purpose in possessing the bullet was to make it into a charm for a bracelet, she was carrying it with her while driving at 1:14 a.m. in Waikiki. Nor did she explain why, if her purpose was benign, she concealed the bullet in an intimate part of her clothing. Nor did she explain where and when she obtained the bullet, and where she was traveling from and going to when she was stopped by police.

*Id.* at 345, 235 P.3d at 341.

■ Here, Pacquing has offered even less with regard to his alleged conduct and the attendant circumstances. None of the facts set forth in Pacquing's declaration of counsel or his de minimis motion explain the circumstances surrounding Pacquing's unauthorized possession of Complainant's confidential personal information. Moreover, the only fact in the circuit court's findings that addresses the circumstances surrounding Pacquing's unauthorized possession of Complainant's confidential personal information was apparently taken from the State's memorandum is opposition, and states, "[Complainant] is [Pacquing's] neighbor."[18] The remaining

17. In its opposition to Pacquing's motion, the State argued, "Had [Pacquing] not been caught, Complainant would have suffered the repercussions of two unjustified traffic citations." Accordingly, we respectfully disagree with the dissent's assertion that these circumstances were never argued by the parties. Dissenting opinion at 200, 297 P.3d at 216.

18. The circuit court's finding that Pacquing and Complainant were neighbors is unchallenged and therefore binding on this court. *See Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 227,

140 P.3d 985, 1007 (2006). Nevertheless, we disagree with the dissent's assertion that this finding is based on evidence submitted by Pacquing. Dissenting opinion at 202, 297 P.3d at 218. In asserting that Pacquing put these facts before the court, the dissent relies on argument contained in Pacquing's Motion to Dismiss, or in the Alternative, Motion for a Bill of Particulars, rather than on the declaration of counsel and argument submitted in relation to Pacquing's de minimis motion. *See* Dissenting opinion at 201–02, 201–02 n. 22, 297 P.3d at 217–18, 217–18 n. 22.

facts in both Pacquing's declaration of counsel and the circuit court's findings of fact address the circumstances surrounding Pacquing's two traffic stops, and do not provide any information with regard to Pacquing's possession of Complainant's confidential information. The fact that Complainant is Pacquing's neighbor does not, by itself, explain how Pacquing came to possess that information.[19]

Moreover, unlike in *Rapozo*, Pacquing did not offer a "benign" explanation for his conduct. *Id.; see also Park*, 55 Haw. at 617–18, 525 P.2d at 592 (concluding that it was an abuse of discretion to dismiss a charge as de minimis "without any indicators to show that [the offense] was in fact an innocent, technical infraction"). Indeed, Pacquing offered no explanation at all. Additionally, although he now asserts that he possessed the Complainant's information in order to avoid arrest, this explanation cannot be described as benign, innocent, or a technical infraction.[20]

Pacquing argues that *Rapozo* is distinguishable from the instant case because, in *Rapozo*, the defense did not present any evidence. However, *Rapozo* is identical to the instant case in this regard. "Rapozo addressed her alleged conduct and the attendant circumstances solely through her attorney's declaration in support of her motion to dismiss." *Rapozo*, 123 Hawai'i at 345, 235 P.3d at 341. Similarly, here, Pacquing addressed his alleged conduct and the attendant circumstances solely through his attorney's declaration in support of his motion to dismiss.

Nevertheless, Pacquing asserts that his case differs from *Rapozo* because, here, "both parties agreed to and stipulated that the facts set forth in the De Minimis Motion and in the State's Memorandum were all of the relevant facts bearing upon the defendant's conduct and the nature of the attendant circumstances regarding the commission of the offense." However, the stipulation did not take place prior to or during the hearing on Pacquing's motion, but rather after the circuit court ruled and the State filed its notice of appeal. Thus, the circuit court did not have jurisdiction to accept the stipulation, and the stipulation was of no effect. *TSA Int'l Ltd. v. Shimizu Corp.*, 92 Hawai'i 243, 265, 990 P.2d 713, 735 (1999) ("Generally, the filing of a notice of appeal divests the trial court of jurisdiction over the appealed case.") (citation omitted). In any event, there was no stipulation as to the facts at the time the circuit court ruled on the de minimis motion.[21]

Finally, even assuming that the State somehow could be limited by its post hoc stipulation, the State did not, as Pacquing asserts, agree that the stipulated facts were "all of the relevant facts bearing upon the defendant's conduct and the nature of the attendant circumstances regarding the commission of the offense." Rather, the State stipulated that "there are no material differences in the recollection of the facts" set forth in the respective memoranda, and that "those facts should be made part of the record[.]"[22] Moreover, regardless of the

19. The dissent concludes that this information would be "naturally acquired over the course of their relationship" and "arose out of the ordinary circumstance of knowing to whom he lived next to." Dissenting opinion at 199, 202, 297 P.3d at 215, 218. Again, the dissent bases this conclusion on argument contained in Pacquing's Motion to Dismiss, or in the Alternative, Motion for a Bill of Particulars, rather than on the declaration of counsel and argument submitted in relation to Pacquing's de minimis motion. Dissenting opinion at 199–200, 297 P.3d at 215–16. Moreover, this explanation does not appear in the circuit court's findings. Respectfully, the dissent's conclusion is speculative.

20. Accordingly, we respectfully disagree with the dissent's assertion that the record indicates that Pacquing could have possessed Complainant's confidential information for an "unobjectionable

purpose." Dissenting opinion at 199, 297 P.3d at 215. The only "purpose" evident in the record was Pacquing's intent to avoid arrest on outstanding warrants.

21. During the hearing on the stipulation, the DPA stated, "Well, my understanding is that back then, I am pretty sure that both sides already stipulated to the facts that were in the respective memorandum[.]" However, there is nothing in the record to indicate that the parties had previously stipulated to these facts. Rather, the only stipulation contained in the record is that which occurred subsequent to the filing of the State's notice of appeal.

22. Accordingly, the dissent's citation to *State v. Adler*, 108 Hawai'i 169, 175, 118 P.3d 652, 658 (2005), in which a party was judicially estopped

State's stipulation, it was nonetheless Pacquing's burden to establish that his conduct did not cause or threaten the harm sought to be prevented by the UPCPI statute, or that it did so only to a trivial extent. *See State v. Fukagawa*, 100 Hawai'i 498, 507, 60 P.3d 899, 908 (2002). For the reasons set forth above, he did not meet this burden.

Accordingly, the circuit court abused its discretion in granting Pacquing's motion to dismiss.

### IV. Conclusion

Although we do not adopt the ICA's reasoning, we agree with its conclusion that the dismissal order must be vacated. Accordingly, we affirm the ICA's February 23, 2012 judgment, which vacated the circuit court's February 11, 2009 Findings of Fact, Conclusions of Law and Order Granting Defendant's Motion to Dismiss for De Minimis Violation, and remanded for further proceedings.

### Dissenting Opinion by ACOBA, J.

I would hold that the decision of the circuit court of the first circuit (the court) to dismiss a violation of Hawai'i Revised Statutes (HRS) § 708–839.55 (Supp.2006), Unauthorized Possession of Confidential Personal Information

(UPCPI)[1] by Petitioner/Defendant–Appellant Chester Pacquing (Petitioner) as de minimis rests within the sound discretion of the court, and the court cannot be said to have clearly abused its discretion. Therefore, I respectfully dissent.

#### I.

#### A.

The record establishes that the facts following were stipulated to by the parties as relevant to Petitioner's Motion to Dismiss for De Minimis Violation (de minimis motion) pursuant to HRS § 702–236 (1993).[2] To recount briefly, Petitioner was the subject of traffic stops conducted by Honolulu Police Department (HPD) Officers Barry Danielson (Officer Danielson) and Darrin Lum (Officer Lum) on two separate occasions, March 23, 2008, and April 7, 2008. During the first stop, Petitioner verbally identified himself as "Michael John Jose," and provided Officer Lum with a date of birth and address.

Officer Lum then issued Petitioner two criminal citations. After Petitioner left the area, Officer Lum realized that he had not provided Petitioner with a copy of one of the citations, and left the copy at the address Petitioner provided. Upon receiving the ci-

---

from taking contrary positions with respect to the applicable law during the course of a case, is inapposite. *See* dissenting opinion at 192 n. 6, 297 P.3d at 208 n. 6.

1. HRS § 708–839.55 provides in relevant part:

    **§ 708–839.55 Unauthorized possession of confidential personal information.**
    (1) A person commits the offense of unauthorized possession of confidential personal information if that person *intentionally or knowingly possesses, without authorization, any confidential personal information of another in any form, including but not limited to* mail, physical documents, identification cards, or information stored in digital form.
    (Emphasis added.) The term "confidential personal information" is defined in HRS § 708–800 as follows:
    "Confidential personal information" means information in *which an individual has a significant privacy interest, including but not limited to a driver's license number, a social security number*, an identifying number of a depository account, a bank account number, a password or other information that is used for accessing information, or any other name, number, or

code that is used, alone or in conjunction with other information, to confirm the identity of a person.
    HRS § 708–800 (emphasis added).

2. HRS § 702–236 provides in pertinent part:

    **§ 702–236 De minimis infractions.**
    (1) The court may dismiss a prosecution if, having regard to the nature of the conduct alleged and the nature of the attendant circumstances, it finds that the defendant's conduct:
    (a) Was within a customary license or tolerance, which was not expressly refused by the person whose interest was infringed and which is not inconsistent with the purpose of the law defining the offense; or
    (b) *Did not actually cause or threaten the harm or evil sought to be prevented* by the law defining the offense *or did so only to an extent too trivial to warrant* the condemnation of *conviction;* or
    (c) Presents such other extenuations that it *cannot reasonably be regarded as envisaged by the legislature* in forbidding the offense.
    (Emphases added.)

tation, the actual Michael John Jose (Complainant) informed the police that the citation was in error.

On April 7, 2008, during the second stop, Petitioner presented a copy of the citation he had received on March 23, 2008 as identification. Complainant arrived at the scene and identified Petitioner by name, indicating that Petitioner was his former neighbor. Petitioner confirmed Complainant's statement. Petitioner stated that he "was scared because [he] had some warrants and did not want to get arrested," and that he "used to live by [Complainant]." Petitioner and Complainant once were neighbors, and Petitioner "came to know" the information he provided to Officer Lum "through the course of their relationship."

### B.

On April 11, 2008, the district court of the first circuit held a preliminary hearing herein. The transcript of the preliminary hearing was never made a part of the record in the proceedings below. At the hearing, Officer Lum testified, in part, that during the first stop on March 23, 2008, after he had contacted dispatch, he "wrote [ ] up" citations in Complainant's name, and included in both citations Complainant's address, date of birth, driver's license number, and the last four digits of Complainant's social security number. Officer Lum related that during the second stop on April 17, 2008, Petitioner handed him the citation he had issued to Petitioner on March 23, 2008.

### C.

On April 14, 2008, Respondent charged Petitioner by complaint (Complaint) with UPCPI. On September 2, 2008, Petitioner filed a Motion for Bill of Particulars (motion for particulars) or in the alternative, a Motion to Dismiss (motion to dismiss). The motion for particulars sought a bill answering whether the date of the alleged offense was the first stop on March 23, 2008, or the second stop on April 7, 2008.

In the Memorandum in Support of the motion to dismiss, Petitioner maintained that, at the time of the first stop, Respondent could prove only that Petitioner possessed Complainant's information "in his head," and, moreover, the information he recited was not confidential because it was acquired during the course of his relationship with Complainant as his neighbor. With respect to the second stop, Petitioner argued that the information on the citation was given to him by Officer Lum.

In response to Petitioner's request for particulars, Respondent asserted that its theory was that Petitioner "possessed Complainant's confidential personal information *in memory and/or on the traffic citation* issued by Officer Lum [during the first stop] to and including the [second stop]." (Emphasis added.) As to the motion to dismiss, Respondent argued Petitioner's conduct fell within the scope of HRS § 708–839.55 because confidential personal information includes " 'any ... name, number, or code that is used ... to confirm the identity of a person.' " (Quoting HRS § 708–800.) In denying the motion for particulars, or in the alternative, the motion to dismiss, the court concluded "Complainant's name, date of birth and street address constitute[d] 'confidential personal information' " because they were "used 'in conjunction with other information to confirm the identity of another person[,]' " i.e., Complainant. (Quoting HRS § 708–800.)

### D.

On October 6, 2008, Petitioner filed his de mimimis motion. In his supporting memorandum, Petitioner maintained that application of the nine factors set forth in *State v. Park,* 55 Haw. 610, 617, 525 P.2d 586, 591 (1974) supported dismissal. In *Park,* this court stated that the following factors (hereinafter, "*Park* factors") should be considered, including:

(1) the background, experience and character of the defendant; (2) knowledge on the part of the defendant of the consequences of the act; (3) the circumstances surrounding the offense; (4) the harm or evil caused or threatened by the offense; (5) the probable impact of the offense on the community; (6) the seriousness of the punishment; (7) the mitigating circumstances; (8) possible improper motives of

the complainant or prosecutor; (9) any other data which may reveal the nature and degree of the culpability in the offense committed by each defendant.

Petitioner maintained that the resulting harm or evil in this case and probable impact on the community was minimal, because the police immediately believed Complainant, and that even if the police had not believed Complainant, the resulting consequence would be "somewhat minimal" in that it would have resulted in Complainant receiving citations. Additionally, Petitioner asserted that his conduct constituted a violation of the offense of Unsworn Falsification to Authorities, HRS § 710–1063(1)(b) (UFTA), instead of UPCPI.[3]

In opposition, Respondent argued, *inter alia,* that Petitioner possessed Complainant's name, address, and birth date "in an effort to use Complainant's identity for his own personal benefit," and that "[Petitioner's] conduct caused 'the harm or evil sought to be prevented' " in that Complainant "would have suffered the repercussions of two unjustified traffic citations" had Petitioner not been caught.

### E.

At a hearing on October 30, 2008, the court addressed both the motion to dismiss and the de minimis motion. The parties reiterated the arguments raised in their memoranda.

### II.

On February 10, 2009, the court denied the motion to dismiss.

On February 11, 2009, the court issued a De Minimis Dismissal Order (Order). The court's findings of fact (findings) largely repeated the facts set forth by the parties' memoranda. The court found, *inter alia,*

that "[Complainant] is [Petitioner's] neighbor." Finding 17. The court entered the following relevant conclusions of law (conclusions):

2. The decision to dismiss a prosecution based upon it being a de minimis infraction is one made by the court. The Hawaii Supreme Court has adopted a "totality of circumstances" test for determining whether an offense is to be treated as a de minimis infraction [*Park,* 55 Haw. at 610, 525 P.2d at 586.]

. . .

4. *In consideration of the first two [ ] factors [set forth in Park] assuming* [Petitioner] knew the requirements of the law, and therefore knew he should not have given another person's information as his own, *the logical conclusion would be that he was committing some form of identity theft or violating a duty to not mislead a police officer.*

5. *With all due regard to the discretion of the Prosecuting Attorney's Office, the proper charge in this case exists pursuant to HRS § 710–1063,* Unsworn Falsification to Authorities, which reads as follows:

(1) A person commits the offense of unsworn falsification to authorities if, with an intent to mislead a public servant in the performance of the public servant's duty, the person:

(b) Submits or invites reliance on any writing which the person knows to be falsely made, completed, or altered.

6. *HRS § 710–1063 is a consequence that a person in [Petitioner's] position could reasonable expect to incur.*

7. *The circumstances surrounding the offense charged, the resulting harm*

---

3. HRS § 710–1063 provides as follows:
§ 710–1063 Unsworn falsification to authorities.
(1) A person commits the offense of unsworn falsification to authorities if, with an intent to mislead a public servant in the performance of the public servant's duty, the person:
(a) Makes any written statement, which the person does not believe to be true, in an application for any pecuniary or other benefit or in a record or report required by law to be submitted to any governmental agency;
(b) Submits or invites reliance on any writing which the person knows to be falsely made, completed, or altered; or
(c) Submits or invites reliance on any sample, specimen, map, boundary-mark, or other object the person knows to be false.
(2) Unsworn falsification to authorities is a misdemeanor.

or evil in this case, and the probable impact upon the community, are minimal. The police immediately believed [Complainant] when he informed them that he did not own a black Acura and he did not get pulled over on March 23, 2008. [Complainant] did not have to appear in traffic court and did not incur any traffic violations as a result of [Petitioner's] conduct. This minimal result does not warrant a felony charge for Defendant, or worse, a felony conviction.

8. The punishment in this case, a felony conviction for [Petitioner], and a potential five-year term of incarceration, is too serious and too harsh. [Petitioner's] actions *did not rise to the level of a felony offense.* Again, Defendant's conduct may *constitute a misdemeanor pursuant to HRS § 710–1063(1)(b).*

9. [Petitioner], being only 24 years old, is a mitigating circumstance in his favor. *The non-violent nature of this offense, and [Petitioner's] history of nonviolence, are also mitigating factors.*

10. *The [c]ourt is also concerned that [Petitioner] has been over-charged* and his misdemeanor conduct was pigeon-holed into a felony statute.

11. *[Petitioner's] conduct caused harm only to a minimal extent,* and [was] certainly not serious enough to warrant a felony conviction.

12. [Petitioner's] conduct also *does not fall within that which was envisioned [sic] by the legislature in forbidding the charged offense.*

13. [Petitioner's] conduct was meant to be prohibited by HRS § 710–1063(1)(b), Unsworn Falsification to Authorities.

14. *The harshness of a conviction is a factor when determining whether a charge should be dismissed under HRS § 702–236. State v. Vance,* 61 Haw. 291, 602 P.2d 933 (1979). In the instant case, a conviction for [Petitioner] could result in an indeterminate five-year term of imprisonment.

15. *[Petitioner's] conduct constitutes a de minimis infraction within the meaning of HRS § 702–236.*

(Emphases added). The court granted Petitioner's de minimis motion. Additionally, the court dismissed the complaint "without prejudice as to the State charging [Petitioner] under a different section of the Hawai'i Revised Statutes." The court stated that "the State may *re-charge [Petitioner] under HRS § 710–1063(1)(b)* within 90 days of the filing of this order." (Emphasis added.)

## III.

### A.

Respondent filed its notice of appeal on March 12, 2009.

At a subsequent hearing before the court on June 17, 2009, Petitioner and Respondent affirmed that, at the time Petitioner's de minimis motion was decided, the parties had stipulated to the facts set forth in their memoranda regarding Petitioner's motion to dismiss *and* Petitioner's de minimis motion. Defense counsel indicated that he wanted to make a record that no testimony was given at the prior hearing on Petitioner's motion to dismiss and de minimis motion because Petitioner and Respondent "agreed to the facts[.]" Respondent concurred that its understanding was that, at the time of the first hearing on Petitioner's de minimis motion, "both sides already stipulated to the facts that were in the [parties'] respective memorandum [sic]," and that "there [were] no material differences in the recollection of facts." Respondent added that both parties were *"in agreement that those facts should be made part of the record*[.]" (Emphasis added.)

On July 20, 2009, Respondent filed its Opening Brief with the ICA. In it, Respondent noted that the facts presented by Respondent and adopted by the court in the order denying Petitioner's motion to dismiss were "more complete and less ambiguous than those in the Order Granting [Petitioner's de minimis motion]," but Respondent did not challenge any of the court's findings. Respondent challenged only certain conclu-

sions of the court.[4] Petitioner filed his Answering Brief on November 13, 2009.

On May 26, 2010, over a year after filing its notice of appeal, and months after the briefs had already been filed, Respondent filed a Motion to Supplement Record on Appeal with Transcript (motion to supplement), pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 10(e)(2)(C).[5] The attached declaration declared in relevant part that "there [was] an additional transcript, that of the preliminary hearing proceeding dated April 11, 2008 … that had not been included in the Record on Appeal" and that "this transcript would allow [the ICA] to conduct a more complete review of this case[.]"

The ICA granted the motion on May 27, 2010. On June 10, 2010, Petitioner filed a Motion to Reconsider the ICA's Order granting Respondent's motion to supplement. Therein, Petitioner argued that it was "not appropriate" for the ICA to consider the preliminary hearing transcript, because neither party submitted nor offered to submit it into evidence at the hearings below and, thus, the transcript of the preliminary hearing "was not received in evidence." On June 21, 2010, the ICA denied Petitioner's motion for reconsideration as untimely.

### B.

On January 25, 2012, the ICA issued a memorandum opinion ruling in Respondent's favor. The ICA stated that " 'it is the defendant's burden to place all of the relevant attendant circumstances before the trial court, and to establish why dismissal of the charge as a de minimis infraction is warranted in light of those circumstances.' " *State v. Pacquing*, No. 29703, 126 Hawai'i 265, 2012 WL 247992, at *4 (App. Jan. 25, 2012) (quot-

ing *State v. Rapozo*, 123 Hawai'i 329, 331, 235 P.3d 325, 327 (2010)).

In the ICA's view, Officer Lum's statement that he included Complainant's driver's license number and last four digits of Complainant's social security number in the citation issued to Petitioner were circumstances pertaining to the charged offense that were not presented to the court. *Id.* According to the ICA, had the court had this evidence before it, such evidence might have affected its analysis. *Id.* The ICA consequently vacated the court's Order.

### IV.

In his Application, Petitioner questions whether the ICA gravely erred in concluding that the court was not presented with all the relevant circumstances. Petitioner argues that (1) the ICA's reliance on *Rapozo* was misplaced; (2) even if the court had been presented with the testimony that the ICA deemed relevant, the court's ultimate conclusion would not have been different; and (3) the court properly applied the *Park* factors.

### V.

Preliminarily, it must be noted that while Respondent argued in its Opening Brief that it intended to prove at trial that the citations included Complainant's driver's license number, it did not mention the inclusion of a portion of Complainant's social security number. Inasmuch as the ICA proceeded to decide the appeal on matters that were not of record, three concerns arise.

First, Respondent moved to supplement the record under HRAP Rule 10(e)(2)(C) and HRAP Rule 27, which prescribe the contents of motions. Even if Petitioner's motion for reconsideration was untimely, HRAP Rule 10(e)(2)(C) only permits supplementation of

---

4. Specifically, in its Opening Brief, Respondent argued that the court erred in concluding (1) "UCPCI was not the 'proper charge' " (challenging conclusions 4, 5, 6, 13); (2) "the impact on the community and Complainant was 'minimal' " (challenging conclusions 7 and 11); (3) "the punishment for UCPCI was 'too harsh' " (challenging conclusions 8, 10, 12, 14); (4) Petitioner's "youth and history of violence [were] mitigating circumstances" (challenging conclusion 9); and

(5) the infraction was de minimis (challenging conclusion 15).

5. HRAP Rule 10(e)(2)(C) provides in part that "[i]f anything material to any party is omitted from the record by error or accident or is misstated therein, corrections or modifications may be" made "by direction of the appellate court before which the case is pending, on proper suggestion or its own initiative."

the record "on proper suggestion" if "anything material to any party is omitted from the record by *error or accident or is misstated* therein." (Emphasis added). However, in its affidavit, Respondent did not indicate that the transcript was omitted "by error or accident or is misstated." Rather, Respondent stated that the "transcript would allow [the ICA] to conduct a more complete review of this case." This explanation does not suggest that something was omitted by error or accident or was misstated.

Instead, it indicates that Respondent sought to add matters that were neither before the court nor before the ICA. But supplementing the record on appeal with evidence not presented to the trial court is improper under HRAP Rule 10(e). *See Fireman's Fund Ins. Co. v. AIG Hawai'i Ins. Co., Inc.*, 109 Hawai'i 343, 126 P.3d 386 (2006) (concluding that none of the provisions of HRAP Rule 10(e) would allow a party to supplement the record with evidence that appeal had become moot where opposing party argued that it was improper to supplement the record with evidence not presented to the trial court). Respectfully, the ICA should not have considered the evidence in the preliminary hearing transcript in deciding the appeal inasmuch as it was not presented to the court.

Additionally, Respondent may be judicially estopped [6] from arguing that there were other facts relevant to Petitioner's de minimis motion because it had stipulated to the facts.[7] Only on appeal to the ICA did Respondent indicate that, while the citations had not been admitted into evidence, it intended "to prove at trial that [Petitioner] was in possession of Complainant's Hawai'i driver's license number, which was entered on [Petitioner's] March 23, 2008 citations by Officer Lum[.]" In his Answering Brief, Petitioner noted that there was no evidence introduced to indicate Complainant's driver's license number was included on the citations issued to Petitioner. No reference was made in Respondent's Opening Brief to the inclusion of the last four digits of Complainant's social security number on the citation. As noted by the ICA, "the parties did not introduce the citations issued to [Petitioner] in Complainant's name or present evidence that Complainant's driver's licence number or the last four digits of Complainant's social security number appeared on the citations[,]" and instead, *both parties argued in their motions "that Complainant's name, birth date, and street address constituted Complainant's confidential personal information that Pacquing possessed without authorization."* Pacquing, 2012 WL 247992, at *3 (emphasis added).

Third, although testified to at the preliminary hearing, none of the filings by Respondent or the stipulated facts support or mention the fact that the driver's license number or the social security number was, in fact, the charged confidential personal information possessed by Petitioner. In any event, assuming, *arguendo*, that Complainant's driver's license and social security number were

---

6. *See, e.g. State v. Adler*, 108 Hawai'i 169, 175, 118 P.3d 652, 658 (2005) (holding that defendant was judicially estopped from arguing on appeal that his commercial promotion of marijuana conviction was barred by licensed doctor's prescription of cannabis under California law, where defendant conceded in trial court that marijuana was a drug that could not be lawfully prescribed).

7. The majority argues that, Respondent was not estopped because Respondent stipulated that there were "no material differences in the recollection of the facts set forth in the respective memoranda," and not that the stipulated facts were "all of the relevant facts bearing upon the defendant's conduct and the nature of the attendant circumstances regarding the commission of the offense." Majority opinion at 187, 187 n. 22, 297 P.3d at 203, 203 n. 22.

However, as discussed in greater detail *infra*, the parties told the court that they did not take any testimony regarding the de minimis motion because, as Petitioner explained, they "agreed to the facts." Respondent confirmed that there were "no material differences in the recollection of the facts." By acknowledging that the parties "agreed to the facts," and not proposing additional facts, Respondent confirmed that it agreed that the "relevant facts" were set forth in the parties' memoranda.

Moreover, as explained *infra*, the fact that Respondent agreed that all of the relevant facts were before the court is also confirmed by Respondent's positions before the court. Respondent did not argue—at any stage—that there were additional facts that the court should have considered as relevant. Presumably, had Respondent believed that additional facts were relevant, it would have said so.

included in the citations, as indicated by the ICA, Respondent may have waived that theory by failing to argue it to the court. Where the State fails to raise a particular theory in support of a motion, or as in this case, in its stipulation before the court, the State may not raise the new theory on appeal.[8]

## VI.

With respect to Petitioner's first argument, this case may be distinguished from *Rapozo* as cited by the ICA. In *Rapozo*, the defendant was charged with Ownership or Possession Prohibited of Any Firearm or Ammunition By a Person Convicted of Certain Crimes, because she possessed a single bullet in her brasserie. *Rapozo*, 123 Hawai'i at 331, 235 P.3d at 327. The bullet was discovered following the defendant's arrest for driving under the influence of an intoxicating substance. *Id.* at 332, 235 P.3d at 328. The defendant argued that she was "going to have [the bullet] made into a charm for a bracelet," and that therefore, the possession of a single bullet "did not actually cause or threaten the harm sought to be prevented or did so only to the extent too trivial to warrant the condemnation of conviction." *Id.;* *see also Rapozo*, 123 Hawai'i at 354, 235 P.3d at 350 n. 7 (Acoba, J., dissenting) (noting that various internet authorities stated that "bullet jewelry has become the latest rage"). The defendant did not testify at the hearing but presented a declaration by her attorney stating that the defendant's "explanation for having the bullet in her possession was that she was going to have it made into a charm for a bracelet." *Rapozo*, 123 Hawai'i at 332, 235 P.3d at 328 (majority opinion). The State did not present any evidence in that case, nor did it object to the presentation of evidence by declaration. *Rapozo*, 123 Hawai'i at 332–33, 235 P.3d at 328–29.

Subsequent to the hearing, the circuit court granted the de minimis motion. *Id.* at 333, 235 P.3d at 329. A majority of this court affirmed the ICA's vacation of the circuit court's order. *Id.* at 349, 235 P.3d at 345. According to the *Rapozo* majority, "[t]he only evidence offered by [the defendant] in support of her motion was the declaration of her counsel, which omitted many of the relevant attendant circumstances." *Id.* at 331, 235 P.3d at 327.

Unlike *Rapozo*, both parties stipulated to the facts in this case. Indeed, the parties agreed that the alleged confidential personal information was Complainant's name, birth date, and address, and that the alleged unlawful conduct was the possession thereof. Consequently, unlike in *Rapozo*, the court *did* have all of the facts relating to the specific "conduct alleged[,]" HRS § 702–236, by Respondent. *See Rapozo* 123 Hawai'i at 331, 235 P.3d at 327.

## VII.

As to his second argument, Petitioner maintains that contrary to the ICA's decision, the testimony from the preliminary hearing would not have affected the court's de minimis conclusion. Indeed, respectfully, the ICA was wrong to suggest that evidence that the citation included Complainant's driver's license number and the last four digits of Respondent's social security number "may have affected the [court's] analysis." *Pacquing*, 2012 WL 247992, at *5.

In its Memorandum opposing Petitioner's motion for particulars, Respondent asserted that Petitioner "possessed Complainant's confidential personal information in memory and/or on the traffic citation issued by Officer Lum [during the first stop] to and including the [second stop]." Therefore, that the citation included Complainant's "confidential personal information," i.e. Complainant's name, address, and birth date, *was already a fact before the court.*

Here, the court found that Petitioner had identified himself to Officer Lum using Complainant's name, address, and birth date, findings 2 and 3; that Officer Lum filled out the citation and Petitioner signed the citation

---

8. *See, e.g., State v. Rodrigues*, 67 Haw. 496, 498, 692 P.2d 1156, 1158 (1985) (noting that "[n]othing in the record even hints that the State was also relying on a finding of exigent circumstances to justify the warrantless search and seizure, or on a 'good faith' exception theory[,]" and having "propounded only the theory of consent to the search in question[,]" "the issues of exigency and a 'good faith' exception to have been waived").

after Officer Lum confirmed there was a valid driver's license number matching Complainant's name, address, and birth date. Based on those facts, the court concluded Petitioner had been in possession of confidential personal information under HRS § 708–839.55. The fact, then, that additional information may have been included in the citation, i.e., Complainant's driver's license number and the last four digits of his social security number, would not have changed the court's analysis. Although the statute specifically mentions a driver's license number and social security number as types of confidential personal information, the court had accorded Complainant's name, address, and birth date the same effect.

Moreover, Petitioner did not provide the license number or social security number to the police. Such information was obtained by the police officer from police sources and given to Petitioner in the form of the citation. Petitioner neither solicited nor willingly obtained Complainant's driver's license number or social security number. Consequently, the preliminary hearing testimony concerning Complainant's driver's license number or social security number would not have altered the court's analysis or ruling, inasmuch as it treated the citations as *already* containing confidential material under HRS § 708–839.55. *See* HRS § 708–800 (defining "confidential personal information").

## VIII.

As to his third argument, Petitioner contends that the court properly applied the *Park* factors set forth *supra.* In its findings and conclusions, the court applied all nine *Park* factors and decided that each factor supported a de minimis dismissal.

### A.

Regarding factor (1), the court concluded that, assuming Petitioner knew the requirements of the law, he would not believe he was committing a violation of HRS § 708–839.55. Conclusion 4. Regarding factor (2),

although Petitioner "knew he should not have given another person's information as his own[,]" the penalty for a violation of UFTA, HRS § 710–1063, "is a consequence that a person in [Petitioner's] position could reasonably expect to incur" as a result of his conduct; not a "potential five-year term of incarceration." Conclusion 4, 8.

Regarding factors (3),(4), and (5), the court concluded that, based on "[t]he circumstances surrounding the offense charged, the resulting harm or evil in this case, and the probable impact upon the community, [were] minimal." Conclusion 7. According to the court, the harm was minimal because "[t]he police immediately believed [Complainant] when he informed them that ... he did not get pulled over on March 23, 2008." The court considered that Complainant could have been forced to "appear in traffic court" or may have "incur[red] [ ] traffic violations."

Regarding factor (6), the court noted that HRS § 708–839.55 carries with it "a felony conviction" and "a potential five-year term of incarceration[,]" which the court deemed as "too serious and too harsh" a punishment for Petitioner's actions. Conclusion 8. Such a consideration was proper under the circumstances of this case. *See Vance,* 61 Haw. at 291, 602 P.2d at 933 (stating that "where a literal application of [a statute] would compel an unduly harsh conviction[,]" HRS § 702–236 "may be applicable to mitigate this result").

Regarding factor (7), the court deemed Petitioner's age of 24, lack of a personal history of violence, and the non-violent nature of the offense as mitigating factors. Conclusion 9.

Regarding factor (8), the court expressed concern that Petitioner had been "overcharged and his misdemeanor conduct [ ] pigeon-holed into a felony statute." [9] Conclusion 10.

Regarding factor (9), the court considered the fact that HRS § 708–839.55 is a non-violent offense and that Petitioner's conduct was more appropriately a misdemeanor,

---

**9.** Specifically, the court noted that "with all due regard to the discretion of the prosecuting attorney's office, the proper charge in this case exists

pursuant to HRS § 710–1063, [UFTA]." Conclusion 5.

UFTA, rather than a felony.[10]  In light of Respondent's concession that Petitioner's conduct also fell within the misdemeanor offense of UFTA, the court did not abuse its discretion in considering this a factor.

Also, in connection with factor (9), the court considered the fact that Petitioner's conduct was not the type of conduct "envisioned [sic] by the legislature" in enacting the statute.  Conclusion 12.  This particular proposition is discussed *infra.*

### B.

The majority does not directly address the court's analysis of the *Park* factors.  Following precedent, the court correctly applied the *Park* factors, and thus the court's conclusion that Petitioner's conduct was de minimis was well within its discretion to make.  " 'The authority to dismiss a prosecution under § 702–236 [thus] rests in the sound discretion of the trial court[ ]' " and the court's decision to dismiss a prosecution thereunder will be reversed " 'only if the court *clearly* exceeded the bounds of reason or disregarded rules or principles of law or practice to a substantial detriment of a party litigant.' " *State v. Hironaka,* 99 Hawai'i 198, 53 P.3d 806 (2002) (quoting *State v. Ornellas,* 79 Hawai'i 418, 420, 903 P.2d 723, 725 (App.1995)) (emphasis added).

The majority's decision to de-emphasize [11] the *Park* test is inconsistent with its reliance on *Park* for the proposition that the court must be aware of "all of the relevant facts bearing upon the defendant's conduct and the nature of the attendant circumstances," before ruling on a de minimis motion.  *See* majority opinion at 180, 297 P.3d at 196 (citing *Park,* 55 Haw. at 616, 525 P.2d at 591).  The majority's analysis also contrasts with the majority opinion in *Rapozo,* which expressly listed all nine *Park* factors for consideration and then stated that "[b]ecause the district court in *Park* failed to take those factors into account in dismissing the charges as de minimis, we reversed its dismissal of the charges." *Rapozo,* 123 Hawai'i at 344, 235 P.3d at 340.  Here, indeed, the court *did* take all nine factors into account before dismissing the charge as de minimis.

### IX.

Instead of addressing the *Park* factors, the majority argues first, that the court abused its discretion because "[Petitioner's] conduct caused or threatened the harm or evil sought to be prevented by the statute," majority opinion at 184, 297 P.3d at 200, and second, because "[Petitioner] did not establish that his conduct was too trivial to warrant the

**10.**  The majority argues that UFTA "is not directed at harms to individuals such as Complainant." Majority opinion at 183 n. 13, 297 P.3d at 199 n. 13. Instead, the majority states that "the clear objective of the statute is to ensure that 'information which the government relies upon is not falsified.' " *Id.* (quoting Commentary to HRS § 710–1063).  However, the Commentary to HRS § 710–1063 also states that "[f]alse testimony and other misleading information to officials can convert governmental power into an instrument of injustice rather than justice, *with unfortunate consequences not only for the individual whose life, freedom or property may be affected,* but also for the community's general sense of security and confidence in the state." Commentary to HRS § 710–1063 (citation omitted) (emphasis added).  In other words, the statute also attempts to "ensure" that, *inter alia,* individuals do not suffer "unfortunate consequences." Thus, as an individual whose "life, freedom, or property" may have been affected by Petitioner's misleading statement, Complainant is also a party the statute intended to protect.

Moreover, both Respondent and the court believed that the charge of HRS § 710–1063 would effectuate punishment for Petitioner's actions. On appeal, Respondent *"agree[d] that it was logical for [Petitioner] to believe he was committing [UFTA]"* and UFTA *"would have been a proper charge."* (Emphases added.)  Similarly, the court stated in conclusion 5 that "the proper charge in this case" was [UFTA], and dismissed the charge without prejudice to allow Respondent to re-file charges of UFTA. Thus, contrary to the majority's position, *both* the parties *and the court* agreed that UFTA would have been a proper charge.

**11.**  The majority argues that it does not " 'de-emphasize' the factors set forth in *Park,*" but instead that it is unnecessary to consider each *Park* factor because it "consider[s] the [*Park* factors] in light of the requirements set forth in the de minimis statute." Majority opinion at 180 n. 9, 297 P.3d at 196 n. 9. In this case, however, the court thoroughly examined all nine *Park* factors. By not addressing the court's analysis, the majority fails to accord the court the deference required by the abuse of discretion standard.

condemnation of conviction." Majority opinion at 180, 297 P.3d at 196.

## X.

In support of its first argument, the majority contends that (1) the harm or evil sought to be prevented by HRS § 708–839.55 is "a broader range of conduct than 'identity theft-related crimes,'" majority opinion at 180, 297 P.3d at 196, (2) the legislature rejected the recommendation of the Anti–Phishing Task Force's (Task Force) to include the offense of UPCPI within the statute prohibiting Identity Theft in the Third Degree, *id.* at 181–82, 297 P.3d at 197–98, (3) the legislature did not "predicate the offense of UPCPI upon an intent to commit identity theft," *id.* at 182, 297 P.3d at 198, (4) the legislature "intended to penalize [Petitioner's] conduct with a felony conviction," *id.*, and (5) unlike in *Viernes*, where the methamphetamine possessed by the defendant could not be used, here there is nothing "to suggest that [Petitioner's] possession of Complainant's confidential personal information could not lead to identity theft or other crimes." *Id.* at 183, 297 P.3d at 199.

### A.

#### 1.

Contrary to the majority's first contention that HRS § 708–839.55 "was intended to deter a broader range of conduct," majority opinion at 182, 297 P.3d at 198, the legislative history demonstrates that the only "harm or evil" *sought to be prevented by* HRS § 708–839.55 was the "rise in identity theft related crimes." S. Stand. Comm. Rep. No. 2508, in 2006 Senate Journal, at 1249.

A task force established to "develop state policy on how best to prevent further occurrences of phishing[12] and other forms of elec-

tronic commerce-based crimes in the state," 2005 Haw. Sess. Laws Act 65, at 14, recognized that "phishing is a relatively small part of the identity theft problem." Anti–Phishing Task Force Report at 4. Rather, "much more work and resources [were] needed to protect Hawaiʻi's people from *identity theft and other electronic commerce-based crimes.*" *Id.* at 5 (emphasis added).

The Task Force believed the "[t]heft of confidential personal information *typically precedes the actual identity theft.*" *Id.* at 3 (emphasis added).[13] Thus, to "curb the rise in identity theft related crimes," the Task Force recommended amending HRS § 708–839.8 "to include a crime for possession or transfer of 'confidential personal information.'" *Id.* at 22.

Addressing the Task Force's specific recommendation to make the unauthorized possession of confidential personal information a felony, the Senate Committees on Commerce, Consumer Protection and Housing, and Media, Arts, Science and Technology believed that this action would *"help deter identity theft crimes."* *Id.* at 1249 (emphasis added).

Contrary, then, to the majority's contention that HRS § § 708–839.55 was intended to affect a range of conduct broader than identity theft, the only harm mentioned by the Task Force and the Senate Committees was "the increasing problem of identity theft." Anti–Phishing Task Force Report at 6, *see also* S. Stand. Comm. Rep. No. 2508, in 2006 Senate Journal, at 1248. This is confirmed by the Commentary to HRS § 708–839.55. *See* Commentary to HRS § 708–839.55 (stating that "[t]he legislature found" that "mak[ing] intentionally or knowingly possessing the confidential information of another without authorization a class C felony would *help to deter identity theft crimes* ")(emphasis added).

12. Phishing is an attempt to deceive "internet users into divulging confidential information ... under false pretenses." Anti–Phishing Task Force Report at 1.

13. The majority cites language in the Task Force report which indicates that some of the perpetrators of identity theft "are close friends and family members." Majority opinion at 181, 297 P.3d at

197 (citing *Anti–Phishing Task Force Report* at 4). The identity of the perpetrators of identity theft is irrelevant to determining whether or not the harm or evil sought to be prevented by the legislature was identity theft or a broader range of conduct. In any event, in this case, there is no evidence that Petitioner was a close friend or family member of Complainant.

### 2.

Hence, the majority's arguments that the legislature sought to deter crimes other than "identity theft" are incorrect. The majority argues that in enacting HRS § 708–839.55, the legislature was concerned with the "immediate purposes" of the statute. Majority opinion at 182, 297 P.3d at 198. But the "immediate purposes" are nothing more than restatements of the legislature's intent to prohibit the unauthorized possession of confidential information. The first purpose cited by the majority is "increasing criminal penalties for conduct that would otherwise constitute a misdemeanor." Because the "conduct" cited by the majority is the unauthorized possession of confidential personal information, this purpose simply means that the legislature sought to increase the penalties for the *possession* of such information. Similarly, the second purpose cited by the majority, "filling a loophole," amounts to proscribing conduct (possession) that was not previously prohibited.

Further, when examined in the legislative context, the harm identified by the majority is actually identity theft, rather than a "broader" harm. The Senate Committees found that it was difficult to "curb the rise in *identity theft related crimes* when *identity thieves* in possession of personal information . . . cannot be prosecuted for crimes other than petty misdemeanor thefts." S. Stand. Comm. Rep. No. 2508, in 2006 Senate Journal, at 1249 (emphases added). As noted, the Committees believed that making the possession of confidential personal information of another a class C felony, i.e., increasing the penalties for conduct that had previously constituted a misdemeanor, "will help *deter identity theft crimes*." *Id.* (Emphasis added.) Therefore, the "immediate purposes" posited by the majority reinforce the conclusion that the harm addressed was identity theft.

### B.

The majority's second contention is that it "appears that the legislature understood UP-CPI to be distinct from identity theft, because it does not involve a 'monetary loss to the victim.'" Majority opinion at 182, 297

P.3d at 198. Respectfully, the majority overstates the inferences that can be drawn from the legislature's decision to separate the UC-PCI offense in HRS § 708–839.55 from the offense of identity theft in the third degree, HRS § 708–839.8. The legislature found that the two offenses were "distinct" from one another, but that did not mean that the offenses were intended to address different harms. Instead, although HRS § 708–839.55 and HRS § 708–839.8 prohibit different conduct, they are aimed at the *same* harm. The Task Force's recommendation of employing two separate measures was to "curb the rise in identity theft crimes" by increasing the penalties for identity theft itself and criminalizing the possession of confidential personal information without authorization. Anti-Phishing Task Force Report at 22. The legislature similarly believed that both increasing the penalties for identity theft by making "identity theft an enumerated offense within the repeat offender statute" *and* "amending the law to make intentionally or knowingly possessing the confidential personal information of another without authorization a class C felony" would "*help to deter identity theft crimes.*" S. Stand. Comm. Rep. No. 2508, in 2006 Senate Journal, at 1249 (emphasis added).

These objectives are manifested in the ultimate placement of HRS § 708–839.55, prohibiting the unauthorized possession of confidential personal information, in Chapter 708, Part IV of the HRS, entitled "*theft and related offenses.*" (Emphasis added.) The legislature thus believed HRS § 708–839.55 was "related" to theft, as was HRS § 709–839.8, third degree identity theft. Additionally, HRS § 708–839.55 directly precedes the offenses of identity theft of different degrees in the HRS, which are located at HRS §§ 708–839.6–708–839.8. Logically, this ordering indicates that *all* of the statutes are related to identity theft.

### C.

The majority's third contention is that in some other jurisdictions, the offense of unauthorized possession of confidential personal information "require[s] that the defendant intended to use the information to defraud

another or commit a crime." Majority opinion at 182, 297 P.3d at 198.[14] However, the legislative history indicates that it was unnecessary to add such language to establish that the purpose of the statute was to prevent identity theft.

The mens rea requirement in HRS § 708–839.55 is that the defendant "intentionally and knowingly" possessed the information without authorization, i.e., that he or she intended to possess the information. Both the Task Force and the Legislature recognized that the unauthorized possession of confidential personal information was a precursor to identity theft. *See* Anti–Phishing Task Force Report at 3. Consequently, there was no need to tie HRS § 708–839.55 to fraud, because the mens rea requirement enumerated by the statute was sufficient to accomplish the stated legislative purpose— "curbing the rise of identity theft related crimes." S. Stand. Comm. Rep. No. 2508, in 2006 Senate Journal, at 1249.

### D.

The majority's fourth contention rejects Petitioner's argument that a felony conviction is "too harsh." Majority opinion at 183, 297 P.3d at 199. This seems beside the point. HRS § 702–236(1)(b) explicitly permits the court to dismiss the charge against Petitioner if his conduct did not "cause or threaten the harm or evil sought to be prevented by the law defining the offense." HRS § 702–236(1)(b). That harm or evil was identity theft. *See* discussion *supra.* Accordingly, under the circumstances, the court had the discretion to determine Petitioner's conduct was a de minimis violation.

### E.

### 1.

The majority's fifth contention, that Petitioner's possession of confidential information could lead to identity theft, was never raised by Respondent, and in any event is inapplicable to the instant case.

Respondent did not raise this theory advanced by the majority, i.e., that simply by possessing Complainant's so called confidential personal information, Petitioner threatened the harm of identity theft. Hence, that argument was waived by Respondent.[15] *See State v. Kikuta,* 125 Hawai'i 78, 89, 253 P.3d 639, 650 (2011) (holding that the State's theory that the defendant's use of force was not justified because it was not reasonably related to the welfare of the minor was waived inasmuch as the State did not make that argument at trial).

Nevertheless, the majority asserts that, unlike in *Viernes,* where the "amount of methamphetamine possessed by the defendant was too small to be sold or used," in this case there is nothing "to suggest that [Petitioner's] possession of Complainant's confidential personal information could not lead to identity theft or other crimes." Majority opinion at 183, 297 P.3d at 199. However, in *Viernes,* the item possessed, methamphetamine, could only be used for illicit purposes. The information possessed in the present case, on the other hand, *could be possessed for innocent purposes.*

Petitioner's motion to dismiss stated that "[Complainant] happens to be [Petitioner's] neighbor," and "through the course of their relationship, [Petitioner] came to know [Complainant's] name, date of birth, and address." The parties stipulated to "the facts that were in the respective memorand[a]." The statement that Complainant was Petitioner's neighbor was in Petitioner's memorandum in support of his motion to dismiss, and therefore was encompassed by the parties' stipulation. Because of their relationship as neighbors, Petitioner's possession of

---

**14.** This language was drawn from a section of the Task Force's report which "review[ed] other jurisdictions' [identity theft] laws" to "distinguish [them] from our laws in the State of Hawai'i." Anti–Phishing Task Force Report at 10.

**15.** The majority maintains that "[Respondent] argued that [Petitioner's] conduct caused the harm or evil sought to be prevented by HRS § 708–839.55," and *Viernes* is "directly applicable on this point." Majority opinion at 183 n. 14, 297 P.3d at 199 n. 14. Respectfully, the proposition cited by the majority is common to *any case* addressing the de minimis statute.

such information could be possessed for an unobjectionable purpose. The statement that Petitioner learned of Complainant's "confidential information" "through the course of their relationship" explains both *how* and *why* Petitioner came to possess Complainant's confidential information.[16] Because information such as a neighbor's name, address, and birth date is conceivably acquired naturally in the course of being a neighbor, the "purpose" behind Petitioner's acquisition of Complainant's confidential information inheres in Petitioner's relationship with his neighbor. In other words, Petitioner's "purpose" arose out of the ordinary circumstance of knowing to whom he lived next to.[17] Such information, once acquired, is usually retained.

Petitioners' statement to Officer Lum that he "was scared because he had some warrants and did not want to get arrested," explains why he *used* Complainant's confidential personal information. Respectfully, under the majority's theory, having to explain "why" Petitioner possessed such information, rests on the proposition that Petitioner could have obtained his neighbor's name, address, and date of birth in anticipation that some day he would be stopped for a traffic infraction and would need such information to avoid arrest. Such a proposition is

implausible. Manifestly, simply possessing this kind of information did not "cause or threaten to cause" the harm of identity theft.

2.

Although the majority maintains that Petitioner *could have* used Complainant's personal information for identity theft, majority opinion at 183, 297 P.3d at 199, there is nothing in the record to support this assertion. It may be reasonably assumed that the parties, including the prosecution, knew more about the innermost facts of the case than this court. Both parties stipulated to the facts and Respondent has never suggested that Petitioner used or intended to use Complainant's personal information for identity theft.[18] Even after Respondent moved to supplement the record, the record is bereft of any references to identity theft. In other words, the majority's hypothesis that Petitioner "could have" used the information to commit identity theft is pure speculation, and there is nothing in the record suggesting that Petitioner intended to commit theft.

XI.

The majority's second argument is that the court erred in deciding that Petitioner's conduct was "too trivial to warrant the condem-

16. This answers the majority's assertion that Petitioner's intent to avoid arrest was "the only 'purpose' evident in the record" that explained Petitioners' possession of Complainant's confidential information. Majority opinion at 186 n. 20, 297 P.3d at 202 n. 20.

17. The majority contends that "[t]he fact that Complainant is [Petitioner's] neighbor does not, by itself, explain how [Petitioner] came to possess [Complainant's confidential] information." Majority opinion at 186, 297 P.3d at 202. The majority also characterizes the conclusion that Petitioner's purpose arose out of the ordinary circumstance of knowing whom he lived next to as "speculative." Majority opinion at 186 n. 19, 297 P.3d at 202 n. 19.

Respectfully, not only is the conclusion that Petitioner acquired Complainant's information over the course of their relationship a natural inference, but this fact was set forth in Petitioner's motion to dismiss and *never challenged by Respondent* throughout the entirety of the litigation. Indeed, Respondent's motions reiterate that Petitioner and Complainant were neighbors. The court's findings also recognized that Peti-

tioner and Complainant were neighbors. Finding 17. Additionally, Respondent confirmed that "there were no material differences in the [parties'] recollection of the facts." As discussed *supra*, Respondent's position demonstrates that it *acknowledged* that Petitioner acquired Complainant's confidential information over the course of their relationship. Thus, the record clearly indicates that Petitioner acquired Complainant's confidential information through the course of Petitioner and Complainant's relationship as neighbors.

18. Although Petitioner used Complainant's personal information, as discussed *supra*, identity theft requires the use of another's personal information *with the intent to commit the offense of theft. See, e.g.,* HRS § 708–839.7 (providing that "[a] person commits the offense of identity theft in the second degree if that person makes or causes to be made ... a transmission of any personal information of another ... with *the intent to commit the offense of theft* in the second degree from any person or entity") (emphases added). Here, nothing in the record suggests that Petitioner intended to commit a theft offense.

nation of conviction." HRS § 702–236(1)(b). The majority contends the court failed to consider (1) the harm threatened by Petitioner's conduct, majority opinion at 184, 297 P.3d at 200, (2) the attendant circumstances surrounding Petitioner's possession of Complainant's personal information, majority opinion at 185, 297 P.3d at 201, and (3) any "benign" explanation for Petitioner's possession of Complainant's personal information, majority opinion at 186, 297 P.3d at 202.

### A.

First, the court obviously *did* address the harm "threatened" by the offense.

### 1.

In conclusion 3, listing the *Park* factors, the court stated that one of the factors to be considered when dismissing a charge as de minimis was "the resulting harm or evil, if any, *caused or threatened* by the infractions." (Emphasis added.) In conclusion 7, the court stated that "[t]he resulting *harm or evil* in this case, and the probable impact upon the community, *are minimal*." (Emphases added.) By referring to "the resulting harm or evil," in conclusion 7, the court was reiterating its earlier conclusion 3, which linked the "resulting harm" to the harm "caused or threatened" by the infractions. In conclusion 7 the court affirmed that the "probable" impact on the community was minimal. Thus, the court indicated that although Petitioner may have "threatened" harm, it was not likely that the harm would be realized, i.e., the harm threatened was minimal.

### 2.

The majority asserts that the court should have made a more detailed assessment of the harm threatened by the offense because "harm to the Complainant was only avoided by a fortuitous turn of events."[19] However, in dismissing an offense as de minimis, the court must consider the attendant circumstances *"regarding the commission of the offense,"* Park, 55 Haw. at 617, 525 P.2d at 591 (emphasis added), and not a string of hypotheticals. Here, the court addressed what *actually* happened-Complainant informed the police that the citation was erroneous, and suffered no further harm. It would have been impossible for the court, as it is for an appellate court, to forecast reasonably what might have happened had the "fortuitous" events *not* occurred.

The majority assumes that Complainant would have been subject to additional traffic citations or a bench warrant if Officer Lum had not neglected to give Petitioner a copy of one citation and then delivered the citation to Complainant. In fact, many other intervening events could have prevented Complainant from incurring citations or being served with a bench warrant. Respectfully, it is not possible reasonably for the majority—as it would not have been possible reasonably for the court—to predict the likelihood of other injuries to Complainant had the actual events *not occurred.* Had it engaged in such an exercise, the court's conclusions would necessarily be arbitrary and capricious.

The circumstances that the majority claims the court failed to consider are circumstances that never existed, and were not argued by any of the parties.[20] Again, after Respondent supplemented the record on appeal, no evidence addressed the probability of Com-

---

**19.** According to the majority, these events were (1) Officer Lum forgot to give Petitioner a copy of one citation, (2) Complainant advised the police he was not involved in the traffic stop, and (3) Petitioner was arrested before any further citations could be issued. Majority opinion at 184, 297 P.3d at 200.

**20.** The majority states Respondent argued in its memorandum opposing Petitioner's de minimis motion, that "[h]ad [Petitioner] not been caught, Complainant would have suffered the repercussions of *two* unjustified traffic citations." Major-

ity opinion at 185 n. 17, 297 P.3d at 201 n. 17 (emphasis added). The majority then argues that this demonstrates that the hypothetical circumstances discussed *supra* were raised by Respondent. *Id.* The majority, however, argues that Petitioner "could have continued to receive additional citations in Complainant's name." *Id.* at 185, 297 P.3d at 201. At no point did Respondent raise the possibility that Complainant would receive additional citations. As stated, the arguments made by the majority go beyond those raised by Respondent.

plainant suffering additional harm from Petitioner's conduct. Furthermore, before the ICA, Respondent did not challenge conclusion 7 on the basis that Complainant could have suffered injury had Officer Lum failed to provide Petitioner with a copy of one citation. Instead, Respondent argued that conclusion 7 was incorrect because the harm actually suffered by Complainant was not minimal.[21] Thus, Respondent also apparently recognized the court could not be faulted for not engaging in calculating hypothetical events.

### B.

Second, the court *did* consider the attendant circumstances surrounding the confidential information.

### 1.

The majority's second contention, that "both [Petitioner] and [the court] failed to adequately address the circumstances surrounding the offense," majority opinion at 185, 297 P.3d at 201, is drawn from *Park*, which stated that "all of the relevant facts bearing upon the defendant's conduct and the nature of the attendant circumstances regarding the commission of the offense should be shown to the judge." *Park*, 55 Haw. at 616, 525 P.2d 586; *see also* majority opinion at 184, 297 P.3d at 200 (quoting *Park* ).

However, as discussed *supra*, the court's conclusions addressed all nine *Park* factors. The majority's analysis only addresses one of the nine factors set forth by *Park*—whether the defendant "threatened" the harm sought to be prevented by the statute. Respectful-

ly, again, it is incongruous to rely on *Park* for the requirement that the court must consider "all of the relevant facts," but then to ignore *Park's* guidance as to what those relevant facts are.

The majority criticizes the court for failing to consider "the circumstances surrounding [Petitioner's] unauthorized possession of Complainant's confidential information." Majority opinion at 184, 297 P.3d at 200. To the contrary, the court *did* consider facts actually placed in the record that explained "the circumstances surrounding [Petitioner's] unauthorized possession of Complainant's confidential personal information."

Petitioner's motion to dismiss explained that "[Petitioner] happens to be [Complainant's] neighbor," and that he "came to know [Complainant's] name, date of birth, and address" through "the course of their relationship." Similarly, Respondent's opposition to Petitioner's motion to dismiss stated that "Complainant related that [Petitioner] used to be his neighbor." As discussed *supra*, these facts were reiterated in and encompassed by the parties' stipulation. Furthermore, the court's findings, stating that "Complainant is [Petitioner's] neighbor," finding 17, also recognized Petitioner's relationship to Complainant. Neither party challenged the court's finding of fact on this issue. Thus, finding 17 is binding on this court. *Bremer v. Weeks*, 104 Hawai'i 43, 63, 85 P.3d 150, 171 (2004) ("Findings of fact that are not challenged on appeal are binding on the appellate court.") (internal citations and punctuation omitted). Hence, the memoranda of both parties and finding 17[22] all state that Petitioner and Complainant were neighbors.

---

21. In its introductory "Statement of the Points of Error," in its Opening Brief, Respondent did cite a statement in its memorandum opposing Petitioner's de minimis motion that "[h]ad [Petitioner] not been caught, Complainant would have suffered the repercussions of two unjustified traffic citations." However, Respondent only cited this statement to demonstrate that the "issue [of harm to the community] was brought to the attention of the court." Respondent did not repeat this statement in its "Arguments" section.

22. The majority "disagrees with the dissent's assertion that this finding is based on evidence submitted by Petitioner." Majority opinion at 185 n. 18, 297 P.3d at 201 n. 18. The majority

contends that "in asserting that [Petitioner] put these facts before the court, the dissent relies on argument contained in [Petitioner's motion to dismiss], rather than on the declaration of counsel and argument submitted in relation to [Petitioner's] de minimis motion." *Id.*

To the contrary, the fact that Petitioner and Complainant were neighbors was cited in *both* Petitioner's motion to dismiss *and* Respondent's opposition to that motion. The parties argued both the motion to dismiss and de minimis motion at the same hearing. No other facts were presented regarding the de minimis motion because the parties stipulated to "the facts in the respective memoranda."

The finding that Petitioner and Complainant were neighbors addresses "the circumstances surrounding Petitioner's unauthorized possession of Complainant's confidential information." Majority opinion at 185, 297 P.3d at 201. As stated before, because Petitioner and Complainant were neighbors, Complainant's name and address would be information naturally acquired over the course of their relationship. The majority concludes that because he did not address the aforementioned circumstances, "[Petitioner] did not meet [his] burden." Majority opinion at 187, 297 P.3d at 203. However, as noted, the record reflects that these circumstances were in fact addressed in the record. It must be noted that Respondent did not argue before either the court or the ICA that Petitioner's relationship with Complainant or the circumstances surrounding Petitioner's unauthorized possession of Complainant's confidential information were circumstances the court had failed to take into consideration. Respondent was well aware of Petitioner's relationship with Complainant and to its credit never disputed the court's finding that Petitioner and Complainant were neighbors or argued that Petitioner's relationship with Complainant was not considered.

### 2.

Respondent must make a "strong showing" to establish an abuse of discretion. *State v. Hinton,* 120 Hawai'i 265, 273, 204 P.3d 484, 492 (2009); *see also State v. Wong,* 97 Hawai'i 512, 517, 40 P.3d 914, 919 (2002) (same); *State v. Kupihea,* 80 Hawai'i 307, 312, 909 P.2d 1122, 1127 (1996) (same); *State v. Estencion,* 63 Haw. 264, 267, 625 P.2d 1040, 1043 (1981) (same). "The term 'strong' means, *inter alia,* 'having particular quality in great degree,' 'compelling' and 'well established.'" *Rapozo,* 123 Hawai'i at 368, 235

P.3d at 364 (Acoba, J. dissenting) (quoting *Websters Third New International Dictionary* 2265 (1966)). The majority does not address the arguments raised by Respondent on appeal, or argue that Respondent's contentions constitute a "strong showing." Thus, the majority apparently places no burden on the prosecution in de minimis proceedings. Ordinarily, under the adversary system, the opposing party bears the burden of demonstrating that evidence provided is erroneous, inadequate, or incomplete. *See State v. Miller,* 122 Hawai'i 92, 117, 223 P.3d 157, 182 n. 24 (2010) ("[T]he usual, and appropriate method for raising errors in the adversarial system is to depend on counsel."). Respectfully, the majority does not hold to this standard in its analysis of this case.

Instead, the majority "faults the court for failing to consider all of the questions which it finds should have been addressed," even though "none of these questions were ever raised at the hearing or otherwise, much less by Respondent." *Rapozo,* 123 Hawai'i at 362, 235 P.3d at 358 (Acoba, J., dissenting). Respectfully, the majority poses questions "which are not grounded in any matter of record even hinting of relevance or materiality." *Id.* at 363, 235 P.3d at 359. The burden of making a strong showing to establish an abuse of discretion would "seemingly require [the majority] to point to something beyond speculation and unsupported theories." *Id.* at 368, 235 P.3d at 364. The majority's arguments do not "strongly" show an abuse of discretion on the court's part. By taking this approach to overturning the court, the majority "invades the province of the court and disregards the standard of review in de minimis cases." *Id.*

### C.

Third, the majority's contention that, "unlike in *Rapozo,* Petitioner did not offer a

---

Furthermore, in its findings of fact regarding both the Order denying Petitioner's motion to dismiss, and the Order granting the de minimis motion, the court stated that Petitioner and Complainant were neighbors. To reiterate, Respondent endorsed the court's findings regarding the motion to dismiss before the ICA, stating that the findings of fact in the Order granting the de minimis motion were "more complete" than

those in the Order granting the de minimis motion. Thus, Respondent did not challenge the finding that the parties were neighbors; rather, Respondent acknowledged that the finding was correct. In sum, the court, Petitioner, and Respondent *all* agreed and acknowledged that the evidence showed Petitioner and Complainant were neighbors.

benign explanation for his conduct," majority opinion at 186, 297 P.3d at 202, is irrelevant. "Benign" would connote "a mild type of character that does not threaten health or life," or is "harmless." *Merriam Webster's Collegiate Dictionary* 106 (10th ed. 1993). It is unclear why the majority requires Petitioner to come forth with a "benign" explanation for his conduct. Nothing in the statute, case law, or in *Rapozo* requires Petitioner to state a benign explanation for his conduct—the *Rapozo* majority only noted that although the defendant set forth a "benign" explanation for her conduct, that explanation was not credible. *See Rapozo*, 123 Hawai'i at 341–42, 235 P.3d at 345–46. Given that in *Rapozo*, a "benign" explanation still resulted in the vacation of the circuit court's order, it is unclear what explanation would be sufficient to satisfy the majority. *See id.* at 354, 235 P.3d at 350 n. 7 (Acoba, J., dissenting).

The majority also cites *Park*, which did refer to "indicators to show" that an offense "was in fact an innocent, technical infraction, not actually causing or threatening any harm or evil sought to be prevented by [the statute], *or* that the harm or evil caused or threatened was so trivial as to warrant the condemnation of conviction." *Park*, 55 Haw. at 617–618, 525 P.2d at 592 (emphasis added). *Park* set forth this requirement in the disjunctive, indicating that the defendant was required to show *either* that the violation was an innocent, technical infraction, *or* that the harm or evil caused or threatened was "trivial." Therefore, Petitioner was not required to show that his violation was an "innocent, technical infraction" or that his conduct was benign.

## XII.

It must also be noted that the majority's suggestion that the court should have considered attendant circumstances not raised by either party is questionable because the parties stipulated to "the facts in the respective memorand[a]," and agreed that "there are no material differences in the recollection of the

facts." The majority maintains that the parties' stipulation is invalid because it occurred after the State filed its notice of appeal, and therefore the court did not have jurisdiction to accept the stipulation. Majority opinion at 186, 297 P.3d at 202. This elevates form over fact. When asking the court to agree to the stipulation, Respondent stated that "both sides *already* stipulated to the facts that were in the respective [memoranda]," and agreed to a further stipulation "just to supplant that." (Emphasis added.)

Despite the parties' agreement as to the facts set forth in their memoranda, the majority maintains that because Respondent only stipulated that "there are no material differences in the [parties'] recollection of the facts," the stipulation does not demonstrate that "all of the relevant facts" were before the court. But, the parties' stipulation *confirmed* that they had previously "agree[d] to the facts" before the appeal was taken. Further confirmation of the parties' agreement was provided by their respective positions on appeal. The majority seemingly disregards the positions taken by the parties at every stage of the proceedings. Following the stipulation, Respondent did not argue at any point that there were additional relevant facts that the court did not consider[23] or that some of the facts before the court were irrelevant.

The burden the majority places on Petitioner is insurmountable—no defendant can predict the "infinite number" of "questions [that] could be posed" by an appellate court but that were not posed in the trial court. *Rapozo*, 123 Hawai'i at 362, 235 P.3d at 358 (Acoba, J. dissenting). Respectfully, the majority's indifference towards the parties positions and the court's evaluation of the relevant facts cannot be justified under the abuse of discretion standard that limits this court's review.

## XIII.

Finally, the majority's focus on the statutory language, HRS § 702–236(1)(c) also

---

**23.** The only possible exception was Respondent's statement that it "intends to prove at trial Defendant in possession of [Complainant's] Hawai'i drivers license number." The majority, however, does not argue that this was a relevant fact not considered by the court. *See* Majority opinion at 179 n. 8, 297 P.3d at 195 n. 8.

provides an independent basis for affirming the court's dismissal of the unauthorized possession of confidential information charge as de minimis.[24] The court may dismiss a prosecution as de minimis if "it finds that the defendant's conduct ... presents such other extenuations that it *cannot reasonably be regarded as envisaged by the legislature* in forbidding the offense." HRS § 702–236(1)(c) (emphasis added).[25] The court addressed this prong of the de minimis statute through conclusion 12, which stated that "[Petitioner's] conduct also does not fall within that which was [envisaged] by the legislature in forbidding the charged offense." The court further noted that, instead "Defendant's conduct was meant to be prohibited by HRS § 710–1063(1)(b), Unsworn Falsification to Authorities." Conclusion 13.

First, HRS § 708–839.55 prohibits the possession of the "confidential personal information of another in any form, including but not limited to mail, physical documents, identification cards, or information stored in digital form." All of the specific examples in the statute relate to the possession of information that is in some sense recorded, either in writing or digitally. Under the canon of *ejusdem generis*, therefore, the general term "in any form" encompasses information that was *recorded*. *See State v. Kalani*, 108 Hawai'i, 279, 284, 118 P.3d 1222, 1227 (2005) ("Under the maxim of ejusdem generis, where general words follow specific words in a statute, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.") (internal quotation marks omitted).

At the time of his first traffic stop, Petitioner "possessed" Complainant's confidential information in his memory. Petitioner had not recorded that information in any form. Inasmuch as on its face HRS § 708–839.55 indicates that the legislature envisaged prohibiting the unauthorized possession of such information in some recorded form, it was reasonable for the court to conclude that "possession" of Complainant's information in Petitioner's memory did not appear to be the conduct "envisaged by the legislature" in conclusion 12.[26] This conclusion is consistent with the court's obligation to strictly construe criminal statutes. *See State v. Aiwohi*, 109 Hawai'i 115, 129, 123 P.3d 1210, 1224 (2005) (stating that "[t]his court has declared that a criminal statute must be strictly construed and that it cannot be extended beyond the plain meaning of the terms found therein.") (internal quotation marks and brackets omitted).

Second, Petitioner arguably did not possess personal information of Complainant that was confidential, as required by HRS § 708–839.55. Complainant's name and address would not be a "secret" to Petitioner. As noted, Petitioner indicated he learned of Complainant's birth date during the course of his and Complainant's relationship as neighbors. The fact that Petitioner "exceeded

24. These considerations also are appropriately considered as a part of the ninth *Park* factor, which addresses "any other data which may reveal the nature and degree of the culpability in the offense committed by each defendant." 55 Haw. at 617, 525 P.2d at 591.

25. The majority argues that it is not necessary to address HRS 702–236(1)(c) because "Petitioner's application does not contain any arguments which specifically address this prong of the statute." Majority opinion at 184 n. 15, 297 P.3d at 200 n. 15. This is incorrect. In his Application, Petitioner at two points argued that "[e]ssentially, [Petitioner] committed the offense of [UFTA]." By arguing that his actions constituted a violation of the offense of UFTA, Petitioner indicated that his actions were not those envisaged by the legislature in enacting the offense of UPCPI.

Moreover, it is necessary to address this matter because the court did decide this issue. It concluded that "[Petitioner's] conduct does not fall within that which was envisioned by the legislature in forbidding the charged offense," conclusion 12, and that "[Petitioner's] conduct was meant to be prohibited by HRS § 710–1063(1)(b), [UFTA]." Conclusion 13. The court also dismissed the charge without prejudice so that Petitioner could be recharged with UFTA.

26. The majority contends that because HRS § 708–839.55 contains the general phrase "in any form," Petitioner's possession of Complainant's confidential personal information in his memory falls within the statutory definition of possession. Majority opinion at 181 n. 10, 297 P.3d at 197 n. 10. However, as discussed *supra*, the canon of *ejusdem generis* limits the general phrase "in any form" to possession in a recorded form.

customary license" by using Petitioner's information in a manner not authorized by Complainant would not transform Complainant's non-confidential information into confidential information. Petitioner's *use* might have been unauthorized but that would not establish that the information he used was confidential.

Finally, the plain language of HRS § 708–839.55 prevents the intentional or knowing possession of confidential personal information "without authorization." Following the first traffic stop, Petitioner did possess a traffic citation containing Complainant's confidential personal information. However, Petitioner did not intentionally obtain or solicit the citation. Instead, Petitioner had no choice but to accept the citation from Officer Lum. There is no evidence that Petitioner knew that Officer Lum would include Complainant's confidential personal information in the citation. Because Petitioner was compelled to accept the citation, Complainant's "authorization" was irrelevant. Under such circumstances, it cannot be said reasonably that Petitioner's possession of the citation was unauthorized.

With respect to the charge of UCPCI under HRS § 708–839.55, Petitioner "possessed" information only "in his memory," possessed his neighbor's name, address, and birth date under circumstances that would not make that information confidential, and subsequently possessed that information in the form of a citation which he had no choice but to accept. Consequently, under the circumstances, the court did not "clearly" abuse its discretion, *Hironaka*, 99 Hawai'i at 205, 53 P.3d at 812, by also concluding that "[Petitioner's] conduct [ ] does not fall within that which was [envisaged] by the legislature in forbidding the charged offense." Conclusion 12.

## XIV.

Based on the foregoing, I respectfully dissent.